## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| **FEDEQ DV004, LLC** and **FEDEQ DV005, LLC**, Florida limited liability companies | ) ) ) | |
| Plaintiffs, | ) ) | |
| **v.** | ) ) | Case No..:_____ |
| **CITY OF PORTLAND**, a Maine body politic and corporate, | ) ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

Plaintiffs FEDEQ DV004, LLC and FEDQ DV005, LLC (collectively, and together with their predecessors in interest as the context requires, "Federated") bring this complaint against Defendant City of Portland (the "City").

## PARTIES

1.      Plaintiff FEDEQ DV004, LLC ("Federated 04"), is a single purpose Florida limited liability company, formed for the purpose of owning and developing real property, which has its principal place of business in Miami-Dade County, Florida.  No members of the foregoing reside in or have a principal place of business in Maine.

2.      Plaintiff FEDEQ DV005, LLC ("Federated 05"), is a single purpose Florida limited liability company, formed for the purpose of owning and developing real property, which has its principal place of business in Miami-Dade County, Florida.  No members of the foregoing reside in or have a principal place of business in Maine.

1

3.     Defendant City of Portland ("City" or "Defendant") is a municipal corporation and the largest city in the State of Maine. City is a "person" under the Site Law as defined in 38 M.R.S.A. § 482(4). City is also a "person" for purposes of 42 U.S.C. §1983.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this case pursuant to, among other Code provisions, 28 U.S.C. § 1331 as it raises a federal question.

5.     Pursuant to 28 U.S.C. §1391, venue is proper in this District because the relevant acts and transactions took place here, the City exists and conducts business here, and the real estate at issue in this action is located here.

## FACTS

**The Project Agreements**

6.     Prior to 2011, the City acquired more than three acres of land from private parties (the "Development Property") and subdivided it into multiple parcels with the intent to develop the property into a lively mixed-use neighborhood in a previously underdeveloped, low-income community.

7.     In 2011, the City selected Federated to acquire the Development Property and develop such a project (the "Midtown Project").

8.     Between 2011 and 2016, Federated and their related predecessors-in-interest, including without necessary limitation The Federated Companies, LLC ("TFC"), Legacy Park Apartments, LLC ("Legacy") and FEDEQ DV001, LLC ("DV001"), entered into at least five primary agreements with the City related to the purchase, sale, and development of the Development Property for the Midtown Project (collectively, the "Project Agreements").

2

9.      The relevant Project Agreements, which were amended and restated over time, included the following:

a. **Purchase and Sale Agreement**, dated June 23, 2011 ("P&S"), as amended by the First Amendment ("First Amendment to P&S") on October 15, 2012, the Second Amendment ("Second Amendment to P&S") on October 14, 2014, the Third Amendment ("Third Amendment to P&S") on October 13, 2015, the Amended and Restated Third Amendment ("Restated Third Amendment to P&S") on February 22, 2016, the Second Amended and Restated Third Amendment ("Second Restated Third Amendment to P&S") on April 16, 2016, and the Fourth Amendment ("Fourth Amendment to P&S") (and collectively with all amendments and restatements, the "Amended P&S") on May 16, 2016.

b. **Parking Garage Agreement**, dated October 15, 2012 ("Garage Agreement"), as amended by the First Amendment ("First Amendment to Garage Agreement") on October 14, 2014, and the Second Amendment ("Second Amendment to Garage Agreement") on May 16, 2016 (and collectively with all amendments and restatements, the "Amended Garage Agreement").

c. **Somerset Street Agreement**, dated October 14, 2014 ("Somerset Agreement").

d. **Corporate Guaranty Agreement**, dated October 15, 2012 ("Corporate Guaranty Agreement"), as amended by the First Amendment ("First Amendment to the Corporate Guaranty Agreement") on October 14, 2014, the Second Amendment ("Second Amendment to the Corporate Guaranty Agreement") on February 2, 2015, and the Third Amendment ("Third Amendment to the Corporate Guaranty

Agreement") on May 16, 2016 (and collectively with all amendments and restatements, the "Amended Corporate Guaranty Agreement").

e. **Job Creation Agreement**, dated October 15, 2012 ("Jobs Agreement").

*See* the true and accurate copies of the Project Agreements, including the amendments and restatements thereto, attached hereto as **Exhibits A-L**.

10.    Ultimately, the last and operative iterations of the Project Agreements related to the purchase, sale, and development of the four parcels comprising the Development Property, namely Lots 1, 3, 6, and 7 of the subdivision comprising the Development Property (collectively, the "Project Property").

11.    The Amended P&S provided for the sale of the Project Property by the City to Federated for the development of the Midtown Project.

12.    Pursuant to Section 6 of the Amended P&S, the City agreed to be and was the subdivision applicant for the Midtown Project.

13.    The Somerset Agreement provided for the improvement of the public thoroughfare known as Somerset Street, which is adjacent to the Project Property.

14.    The Amended Garage Agreement provided for Federated's construction of a parking garage on Lot 6 of the Project Property (the "Garage").

15.    Through the Amended Garage Agreement, the City agreed to disburse over $9 million of grant funds ("Grant Funds"), which it obtained in part through a loan from the U.S. Department of Housing and Urban Development ("HUD"), to Federated for use in construction of the Garage.

16.     The Amended Corporate Guaranty Agreement provides for certain guarantees by Federated related to the Midtown Project, which are conditioned on Federated's receipt of the full amount of the Grant Funds.

17.     The Jobs Agreement required Federated to create 40 new full-time positions within two-years of receiving a certificate of occupancy for the Garage in exchange for the Grant Funds.

18.     The Jobs Agreement conditionally transferred HUD's jobs creation requirements from the City to Federated.

**The Remaining Conditions Letters and the City's Obstruction of the Building Permit**

19.     In or about 2014, the City Planning Board ("Planning Board") conditionally approved Federated's initial plan for the Midtown Project ("Master Development Plan") ("2014 Approval").

20.     The 2014 Approval was administratively appealed, resulting in a revised, conditional, approval by the Planning Board ("2015 Approval") for a project that was smaller in scope than the original Master Development Plan, and was issued a permit overlapping with the Master Development Plan.

21.     A building permit was also required for the Midtown Project (the "Building Permit"). The City's Permitting and Inspections Department was responsible for granting or denying Federated's application for the Building Permit that was required for the Midtown Project.

22.     In the event that Federated had not received the Building Permit prior to the closing date of June 16, 2016, Section 8 of the Amended P&S provided Federated with the option to either "(1) . . . elect to terminate the [P&S], or (2) agree to proceed to Closing without the Building Permit."

23.     Through the Second Amendment to the P&S, the Third Amendment to the P&S, the Restated Third Amendment to the P&S, the Second Restated Third Amendment to the P&S, and the Fourth Amendment to the P&S, Federated and the City made changes to the P&S, in part, to accommodate a later closing date because Federated had not yet received a Building Permit for the 2015 Approval or any other iteration of the Midtown Project.

24.     In or about October 2015, following a months-long period of municipal refusal to discuss or work on advancement of the Midtown Project, and a refusal to honor the P&S by the City, the City conditioned its willingness to proceed with the sale of the Midtown Project property on a premature closing, even though Federated was not yet required to acquire the property under the P&S as then amended, resulting in the Third Amendment to P&S.

25.     As a compromise and in good faith, and as stated in the Third Amendment to P&S, Federated agreed to proceed to Closing if the City would issue the Midtown Project a Building Permit by a date certain.

26.     In or about April 2016, the City, through its then City Manager, Jon P. Jennings ("Jennings"), also agreed to review Federated's construction documents pertaining to the Garage in advance of the filing of a formal Building Permit application, so that the Midtown Project's Garage would be approved on an expedited schedule and the project would be construction-ready as soon as Federated paid a Building Permit application fee in the future.

27.     On or about April 16, 2016, Federated delivered the City all construction documents and plans necessary to review the Garage for construction approval.

28.     When the City failed to issue the Midtown Project a Building Permit prior to the scheduled closing date under the Third Amendment to P&S (citing outstanding conditions of the 2015 Approval imposed by the Planning Board), as an alternative, Federated asked the City by

email dated May 28, 2016 to confirm in writing that the only remaining conditions of such approval necessary for Federated to satisfy prior to receipt of a Building Permit were (1) staff approval of Federated's construction management plan, and (2) the payment of mitigation fees outlined in the 2015 Approval. *See* a true and accurate copy of May 28, 2016, email attached hereto as **Exhibit M**.

29.     Federated made this request to assure itself of the limited nature of conditions remaining before procurement of a Building Permit, and to obtain certainty with regard to its future ability to construct the Midtown Project.

30.     On June 1, 2016, in response to Federated's request, and in advance of its sale of a portion of the Development Property for the Midtown Project to Federated, the City, through Stuart "Tuck" O'Brien ("O'Brien") itemized the remaining conditions that Federated had to satisfy for the City to issue the Building Permit. *See* a true and accurate copy of City's June 1, 2016 email (the "First Remaining Conditions Letter") attached hereto as **Exhibit N.**

31.     O'Brien was the City's Director of City Planning responsible for overseeing a permit applicant's satisfaction of conditions necessary for approval.  He was also the former Chairman of the Planning Board at the time it issued the 2015 Approval and conditions thereto.

32.     The First Remaining Conditions Letter represented that the only additional conditions Federated had to satisfy prior to the Planning Board's issuance of a Building Permit were: (a) Federated's finalization of an acceptable construction management plan; and (b) certain enumerated fees.

33.     The First Remaining Conditions Letter confirmed that the conditions listed in Federated's May 28, 2016 email were the only remaining conditions.

34.     The remaining conditions in the First Remaining Conditions Letter were in addition to the extensive list of conditions that Federated had already satisfied.

35.     In a subsequent letter from the City to Federated dated June 29, 2016, the City reiterated its confirmation of the only remaining conditions set forth in the First Remaining Conditions Letter. *See* a true and accurate copy of City's June 29, 2016, letter (the "Second Remaining Conditions Letter") attached hereto as **Exhibit O.**

36.     Neither the First Remaining Conditions Letter nor the Second Remaining Conditions Letter required Federated to post a performance guaranty of any kind.

37.     Neither the First Remaining Conditions Letter nor the Second Remaining Conditions Letter mentioned directly or indirectly the applicability of any other conditions not enumerated therein.

38.     In reliance on the City's First Remaining Conditions Letter and the City's commitment to conduct an advanced and expedited review of the Garage's Building Permit plans, Federated opted not to terminate the Second Restated Third Amendment to P&S (as it was entitled to do up until five days prior to the stated closing date in the event a Building Permit had not issued within thirty days of said date) and, following one final amendment to its contractual arrangement with the City, closed on the Property on June 16, 2016, well before it was obligated to do so and without a Building Permit.

39.     Federated would not have closed on its acquisition of the Midtown Project property but for the City's express certifications (given on multiple occasions in writing by email, letter and text message, as well as verbally) that the universe of remaining conditions under the 2015 Approval necessary to satisfy prior to issuance of a Building Permit was narrow, defined, and

exactly as outlined by the City following Federated's request for clarity in May and June 2016 leading up to closing.

40.     In or about October 2016, after years of unsuccessfully attempting to receive City approval for its construction management plan, Federated approached the City about returning to a phased project of greater density, and taller in height, as was first contemplated by the 2014 Approval of the Master Development Plan (the "Revised Project Concept") – the goal being to approach construction in a manner the City would approve.

41.     In an email from the City to Federated dated October 13, 2016, the City expressed excitement about Federated's interest in potentially pursuing a Revised Project Concept. *See* a true and accurate copy of the October 16, 2016 email ("MDP Confirmation Email") attached hereto as **Exhibit P.** In the MDP Confirmation Email, the City also recommended that Federated amend the earlier Master Development Plan permit embodied in the 2014 Approval to effectuate the Revised Project Concept, rather than amending its 2015 Approval. *See* **Ex. P**.  The City's stated reason for its recommendation to amend the Master Development Plan in the 2014 Approval was that doing so would permit seven additional years for Federated to commence construction, as opposed to 18 months. *See* **Ex. P**.

42.     In reliance upon the MDP Confirmation Email, and at its expense, Federated held multiple meetings with community members and the local neighborhood association in order to gain support for its intended Midtown Project revisions, underwrote a revised project, adjusted company-wide investment priorities, and renegotiated with and engaged multiple third parties to design a revised Midtown Project, thus superseding prior project design and development contracts toward the end of pursuing a shared vision for development with the City.

43.    Under the Revised Project Concept for the Midtown Project, the Garage remained unchanged, and, as such, Federated proceeded apace with plans to obtain a Building Permit and have the Garage fully approved for construction.

44.    While Federated proceeded apace with the Garage, it worked on a parallel track to revise and refine other elements of the plan for a formal entitlement revision process with the Planning Board.

45.    Over the following two years, Federated worked with the City closely to finalize the Midtown Project's construction management plan, but was unable to obtain City approval.

46.    Federated relied upon the City's express statement contained in the MDP Confirmation Email that the Master Development Plan had continuing validity as part of its determination of when to file for a Building Permit.

47.    In or about January 2018, Federated submitted a formal application for the Building Permit.

48.    That same month, following inquiries from Federated concerning its financial contributions to the Midtown Project, Federated was advised by the City through O'Brien that the City and specifically Jennings were "done with the [Midtown] Project", and it was "headed to litigation".

49.    Also that same month, Federated was advised by the City in an about face that, notwithstanding the express confirmations contained within the MDP Confirmation Email, the Master Development Plan permit had expired or was superseded by the 2015 Approval, and, consequently, Federated only had a matter of weeks to obtain a Building Permit and commence construction of the Garage, before the 2015 Approval expired in March of 2018.

50.    In or about February 2018, in order to perfect its entitlements and in a good faith effort to advance the Midtown Project, Federated paid sums exceeding $250,000.00, for the City to review its formal Building Permit application for the Garage.

51.    To expedite the review process, Federated even paid additional sums for a prequalified, City-approved third-party construction plan reviewer to review its Building Permit application on behalf of the City.

52.    By March 2018, Federated had conducted an extensive bid process and negotiated contracts with various environmental remediation and site-work firms for the initial steps required to undertake construction of the Garage on Lot 6 prior to expiration of the 2015 Approval conditional permit issued by the Planning Board.

53.    By March 23, 2018 -- i.e., the last business day before Federated's 2015 Approval was due to expire and Federated was required to commence construction in order to ensure the continuing validity of that entitlement in the event a Building Permit issued - the City still had not fully approved Federated's construction management plan, notwithstanding Federated's submission of fourteen separate, professionally-prepared versions of that document over the course of four calendar years.

54.    Instead, the City conditionally approved the construction management plan in a manner and at a time leaving Federated virtually unable to comply with the same.

55.    In an email dated March 23, 2018 i.e. the last date on which approval of Federated's Building Permit application for the Garage could have been approved  and the last business day on which construction of the Garage under that permit could commence in order to ensure the continuing validity of the 2015 Approval -- the City, through O'Brien, advised Federated that its inspections staff was prepared to issue a Building Permit, conditioned on Federated's provision of

a performance guaranty for all site work to be completed for the entire Midtown Project. The sum was estimated to exceed $10 million and the City required it to be posted in cash. *See* a true and accurate copy of March 23, 2018, email attached hereto as **Exhibit Q**.

56.    The performance guaranty was not mentioned or included within the enumerated remaining conditions outlined by either the First Remaining Conditions Letter or the Second Remaining Conditions Letter.

57.    In light of a disagreement between Federated and the City concerning applicability of a performance guaranty as a condition precedent to issuance of the otherwise-approved Building Permit application, coupled with the City's indication to Federated that the project was "headed to litigation", Federated retrieved certain mitigation contribution fees it had previously delivered to the City, via check ("Mitigation Fees").

58.    Federated had previously delivered the Mitigation Fees to satisfy what it understood to be the only other conditions, beyond approval of its construction management plan, necessary to satisfy prior to issuance of a Building Permit.

59.    Federated advised the City in writing that such funds were being held locally and would be redelivered the instant the City agreed to abide by the terms of its First Remaining Conditions Letter and Second Remaining Conditions Letter with respect to the list of remaining conditions of approval, which did not include payment of a multi-million dollar performance guaranty. *See* a true and accurate copy of Federates' March 12, 2018, email attached hereto as **Exhibit R.**

60.    The City never reversed its position concerning the need to post a performance guaranty prior to issuance of an otherwise approved Building Permit application.

61.     By letter dated March 27, 2018, the City advised Federated that its Building Permit application had been denied. *See* a true and accurate copy of City's March 27, 2018, letter attached hereto as **Exhibit S**.

62.     As reason for its denial of the Building Permit, the City cited three distinct bases, including 1) expiration of the 2015 Approval on March 25, 2018, a Sunday, 2) Federated's failure to post a performance guaranty, and 3) Federated's "failure to provide" mitigation contribution fees arising from the 2015 Approval (the "Mitigation Fees").

63.     Neither the First Remaining Conditions Letter nor the City's Second Remaining Conditions Letter required Federated to post a performance guaranty as a condition for approval of the Building Permit.

64.      Additionally, in Section 4 of the Somerset Agreement, the City affirmatively waived the performance guaranty requirement, which it was empowered to do pursuant to Section 14-501 of the City's Code of Ordinances.

65.     Even if a performance guaranty had been required, the City which was the Midtown Project's subdivision applicant, would have been the party required to post a performance guaranty—not Federated—pursuant to Section 14-499 of the City's Code of Ordinances.

66.     The City did not post a performance guaranty for any component of the Midtown Project.

67.     Unless waived, where required, a performance guaranty must be paid prior to recordation of a subdivision plan pursuant to the City's own Code of Ordinances.

68.     Notwithstanding the foregoing, the City recorded the subdivision plan approved as part of the 2015 Approval and without a performance guaranty, in contravention of its own municipal law, so that it could reference the land conveyed to Federated in June 2016.

**City's Failure to Complete Requisitions Related to Amended Garage Agreement and Somerset Agreement.**

69.     Under Section 3 of the Somerset Agreement, Federated was to deliver to the City written request(s) for disbursement related to the City's share of the Midtown Project costs related to the Somerset Agreement (each, a "requisition").

70.     On or around February 15, 2017, Federated submitted its first requisition to the City for a portion of the City's cost share under the Somerset Agreement in the amount of $147,525.00 (the "First Somerset Requisition"). *See* a true and accurate copy of Federated's First Somerset Requisition attached hereto as **Exhibit T**.

71.     The City initially refused to pay the First Somerset Requisition, citing a number of bases for rejection (the "Somerset Requisition Denial Bases"), but ultimately paid it in June 2017 after Federated refuted those bases. *See* a true and accurate copy of City's Somerset Requisition Denial Bases Letter attached hereto as **Exhibit U**.

72.     By paying the First Somerset Requisition, the City waived the Somerset Requisition Denial Bases.

73.     Under Section 4(a) of the Amended Garage Agreement, Federated was to submit requisitions to the City for disbursement of the Grant Funds related to the Amended Garage Agreement.

74.     On or around June 9, 2017, Federated submitted a draft of its first Garage requisition, together with a memorandum of understanding expressing its intent that the City review such draft in advance of it being formalized, so that Federated could assure itself of the acceptability of all expenses included.

75.     Following the initial draft Garage requisition, the City advised Federated that certain included expenses were deemed ineligible, and Federated resultantly removed $11,105.60 from the draft prior to submitting a finalized formal copy.

76.     On or around June 27, 2017, Federated submitted its first formal Garage requisition to the City inclusive of all approved expenses incurred on the Garage to date, but only sought disbursement of $999,999.00 of the Grant Funds (the "First Garage Requisition"). *See* a true and accurate copy of Federated's First Garage Requisition attached hereto as **Exhibit V**.

77.     The City approved and paid the First Garage Requisition.

78.     On or around September 27, 2017, Federated submitted its second Garage requisition to the City for disbursement of Grant Funds in the amount the balance of funds initially approved by the City in the First Garage Requisition, i.e., $164,174.00 ("Second Garage Requisition"), in line with the Amended Garage Agreement. *See* a true and accurate copy of Federated's Second Garage Requisition attached hereto as **Exhibit W.**

79.     The Amended Garage Agreement called for the first $1 million in Grant Funds to be requisitioned within 90 days of the initial Garage requisition. *See* **Ex. W**.

80.     Pursuant to Section 4(d) of the Amended Garage Agreement, the City was required to fund the requisition request within fifteen (15) days.

81.     The City did not pay the Second Garage Requisition within fifteen days, nor did it explain to Federated within that time period why it had not done so, or if and what additional information it may require in order to pay the Second Garage Requisition.

82.     Federated inquired about the status of the Second Garage Requisition many times between September and March 2018, to no avail.

83.     During this time period, on or about January 27, 2018, March 6, 2018 and March 20, 2018, Federated also notified the City of its default under the Amended Garage Agreement due to its failure to pay the Second Garage Requisition.

84.     To date, the City still has not paid the Second Garage Requisition, nor has it paid contractually agreed to interest payments on its failure to do so.

85.     On or about March 1, 2018, Federated submitted its second requisition to the City for a portion of the City's cost share under the Somerset Agreement in the amount of $2,668,000.00 (the "Second Somerset Requisition"). *See* a true and accurate copy of Federated's Second Somerset Requisition attached hereto as **Exhibit X**.

86.     Under Section 3(d) of the Somerset Agreement, the City was required to fund the requisition request within fifteen (15) days.

87.     The City did not fund the Second Somerset Requisition within fifteen days, and to date has not paid the Second Somerset Requisition.

88.     On or about March 20, 2018, Federated delivered a formal notice of default to the City advising it of its breach of the Somerset Street Agreement for failure to fund its Second Somerset Requisition.  *See* a true and accurate copy of Federate's Notice of Default letter attached hereto as **Exhibit Y**.

89.     The City made no effort to cure its default for failure to fund the Second Somerset Requisition.

90.     On or about March 6, 2017, Federated submitted a third requisition of funds from the Grant Funds pursuant to the Amended Garage Agreement ("Third Garage Requisition"). *See* a true and accurate copy of Federated's Third Garage Requisition attached hereto as **Exhibit Z**.

91.     The Third Garage Requisition was inclusive of both the Second Garage Requisition and new costs associated with the Third Garage Requisition. *See* **Ex. Z.**

92.     The City did not pay the Third Garage Requisition.

93.     On or around March 16, 2018, in a letter from the City to Federated, the City, for the first time, denied all outstanding requisitions unless and until Federated complied with certain extra-contractual conditions precedent to such funding. *See* a true and accurate copy of the March 16, 2018 letter (the "March 2018 Letter") attached hereto as **Exhibit AA**.

94.     The March 2018 Letter also improperly imposed a deadline for Federated to reach a certain phase of the Midtown Project. *See* **Ex. AA**.

**The City's Improper Use of Eminent Domain to Nullify the Amended Garage Agreement and Circumvent the Repurchase Provisions of the Project Agreements.**

95.     On or about February 19, 2019, in a letter from the City to Federated, the City reiterated its improper conclusions from the March 2018 Letter. *See* City's February 19, 2019 (the "February 2019 Letter"), a true and accurate copy of which is attached hereto as **Exhibit AB.**

96.     Many of the assertions made within the March 2018 Letter were, moreover, substantively recycled versions of the previously-waived Somerset Requisition Denial Bases.

97.     The February 2019 Letter also threatened that the "the City will move forward breach of contract proceedings seeking the repurchase remedy set forth in ¶ 9 of the Garage Agreement." *See* **Ex., AB**.

98.     On or about March 4, 2019, in an email from Federated to the City, Federated responded to the City's February 2019 Letter addressing its inaccuracies and misinterpretations. *See* Federates' March 4, 2019 email (the "March 2019 Response"), a true and accurate copy of which is attached hereto as **Exhibit AC**.

99.    The City never replied to Federated's March 2019 Response, or further addressed its February 2019 Letter.

100.    On or around August 16, 2019, Federated filed suit against the City, alleging claims including, *inter alia,* breach of the Somerset Agreement and breach of the Amended Garage Agreement. <u>*See*</u> FEDEQ DV004 et. al. v. City of Portland et. al., C.A. No. 2:19-CV-00382-LEW (D. Maine Aug. 16, 2019) (the "2019 Complaint").

101.    The 2019 Complaint alleged, among other things, that the City breached the Garage Agreement when it failed to disburse funds following the Second Garage Requisition, and that the City breached the Somerset Agreement when it failed to disburse funds following the Second Somerset Requisition.

102.    The 2019 Complaint also alleged that the City fraudulently induced Federated to close the Amended P&S without a building permit by misrepresenting to Federated, in the First Remaining Conditions Letter, that all conditions for a building for permit were met except for a construction management plan and certain fees.

103.    In turn, the City filed a counterclaim to the 2019 Complaint, alleging that Federated had breached each the Amended Garage Agreement and Somerset Agreement (together with the 2019 Complaint, the "2019 Lawsuit").

104.    The 2019 Lawsuit was stalled by significant discovery disputes and did not substantially progress past the pleadings stage.

105.    From in or about May 2021 through September 2021, the City and Federated unsuccessfully attempted to resolve the 2019 Lawsuit through Magistrate-supervised mediation.

106.    Unbeknownst to Federated, during the same time period that Federated thought the parties were trying to amicably resolve their claims in good faith, the City surreptitiously took

steps to initiate eminent domain proceedings to circumvent the relevant repurchase provisions underlying its contractual remedy in the 2019 Lawsuit, i.e., a conditional right to repurchase Lot 6.

107.    Indeed, as early as January 2021 the City began preparing for the taking of Lot 6 by conducting an eminent domain appraisal of Lot 6 under the guise of preparing an "expert witness" for unrelated purposes.

108.    The subject appraisal was conducted by O'Connell Valuation Services, Inc. ("O'Connell"), which prepared a report that dramatically undervalued the property at negative $120,000, later resulting in a nominal payment of just $10.00 to the impacted parties at the time of taking. *See* O'Connell's May 25, 2021, Appraisal Report ("Appraisal Report") a true and accurate copy of which is attached hereto as **Exhibit AD**.

109.    On or about September 18, 2021, the City's Council approved a condemnation order for Lot 6, which was the subject parcel of land for the Garage. *See* City's Order Condemning Property Rights of FEDEQ DV004, LLC ("Condemnation Order") a true and accurate copy of which is attached hereto as **Exhibit AE**.

110.    The City purported that public exigency required the City to take Lot 6 to promote public access and use and that Lot 6 was suitable for use as a public use garage or revenue-generating municipal parking facility. *See* **Ex. AE**, Section (i).

111.    In other words, the City purported to take Lot 6 for the exact same use it sold Lot 6 to Federated for, after itself preventing Federated from pursuing precisely that use by its denial of a Building Permit for the Garage.

112.    The Condemnation Order was recorded in the Cumberland County Registry of Deeds on or around September 23, 2021.

113.    Federated paid the City $2.35 million for the Midtown Project Property, including Lot 6.

114.    Lot 6 and the Garage thereupon was and is a central component of the Midtown Project.

115.    Federated has spent millions of dollars in designing the Midtown Project, Garage construction and Somerset Street improvements.

116.    Without Lot 6, the plans relating to the Midtown Project are worthless, which has deprived Federated of the ability to realize a return on its significant, years-long investment of time, resources and capital toward what was at one point a vision shared with the City for development of the Project Property as presently designed, and rendered Lots 1, 3 and 7 unsaleable as they are encumbered by significant land use restrictions specifically tied to a Garage site Federated no longer possesses.

117.    Upon information and belief, the City intends to seek other developers to construct a parking garage on Lot 6—the very reason for which it sold Lot 6 to Federated – relying on Federated's fully approved, construction-ready Garage plans, which it possesses but did not pay for.

118.    The City's actions described above reflect, among other things, a flagrant, willful, intentional, and wanton disregard for the Plaintiff's rights under the United States Constitution, the Constitution and laws of the State of Maine and the Project Agreements.

119.    Ultimately, the City and Federated mutually agreed to a stipulated dismissal of the 2019 Lawsuit, in order to attempt resolution of their cross disputes comprehensively in the context of an appeal of the City's eminent domain taking, but they did so without prejudice in the event such efforts proved fruitless.

120.   To date, Federated and the City have been unable to resolve the disputes amongst them in the aforementioned context.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
**As to the Amended P&S**
**(Miscellaneous Provisions)**
**By Federated**

121.   Federated restates and realleges paragraphs 1 through 120 as if restated herein.

122.   The Amended P&S is and was at all relevant times hereto a valid and enforceable contract.

123.   Federated fully complied with its duties and obligations under the Amended P&S, including the Fourth Amendment to P&S, and was never in default thereof.

124.   Section IV.2. of the Fourth Amendment to P&S ("Miscellaneous Provisions") is a material contract term and states as follows:

> Notwithstanding anything to the contrary in the P&S and Related Agreements, as amended, nothing therein shall be construed to permit the repurchase of the Garage Property for reasons other than those stated in the Garage Agreement, as amended, or paragraph 3 of the Jobs Creation Agreement.

125.   Section 9 of the Amended Garage Agreement provides the permissible reasons for repurchase of the Garage Property as follows:

> In the event that [Federated] is in default of a material provision of any of the obligations contained in this Parking Garage Agreement. . . then [Federated] shall, if requested to do so by the City, convey to the City the Garage and related real property. . . .

126.   Pursuant to Section IV.2. of the Fourth Amendment to P&S, and Section 9 of the Amended Garage Agreement, the only reason permitting the City to repurchase the Property was Federated's default on its obligations in the Amended Garage Agreement.

127.    Stated differently, the City contractually agreed that any reason for repossession of the Lot 6 property -- except the default of Federated -- was an impermissible reason for reacquisition.

128.    The City had no permissible reason to repurchase the Property under the Fourth Amendment to P&S.

129.    In an effort to avoid complying with the Fourth Amendment to P&S, in 2021, the City began condemnation proceedings purporting to take the Property through eminent domain.

130.    Through its exercise of eminent domain, the City "repurchased" Lot 6 for $10.

131.    The City "repurchased" the Lot 6 for a reason other than that which is permitted in the Amended Garage Agreement.

132.    The City's "repurchase" of Lot 6 for a reason other than that which is permitted in the Amended Garage Agreement was a breach of Section IV.2. of the Fourth Amendment to P&S.

133.    Section I.3. of the Second Amendment to Garage Agreement details the price at which the City would be permitted to repurchase the Property:

> The cost to the City for this purchase will be, in concept, be the greater of (1) the sum of the cost of construction of the Garage and all related improvements associated with the Garage, plus the cost to [Federated] for the related land upon the which the Garage sites (the "Garage Land"), or (2) the fair market value of the Garage Land and the building and improvements thereon; less the amount of the City Grant Funds actually disbursed up to the time of this repurchase (the "Repurchase Price").

134.    The City's payment of $10 to Federated in connection with the taking did not follow the calculation set forth in Section I.3. of the Second Amendment to Garage Agreement.

135.    The City's payment of $10 to Federated for its "repurchase" of the Property was a breach of Section I.3. of the Second Amendment to Garage Agreement.

136.    As a direct and proximate cause of the City's breach, Federated has suffered and continues to suffer damages and is entitled to recover said damages from the City.

**COUNT II – BREACH OF CONTRACT**
**As to the Amended P&S**
**(Seller Representations and Warranties to Buyer)**
**By Federated**

137.    Federated restates and realleges paragraphs 1 through 136 as if restated herein.

138.    The Amended P&S is and was at all relevant times hereto a valid and enforceable

contract.

139.    Federated fully complied with its duties and obligations under the Amended P&S,

including but not limited to the Section 3(c), and was never in default thereof.

140.    Section 3(c) of the Amended P&S provides in relevant part:

(c)  Seller represents and warrants to Buyer, effective as the date of this Agreement and
also effective as of the date of Closing, that: . . . (ii) there are no uncorrected violations of
any laws or codes with respect to the Property, its condition, or use; . . . (vii) this Agreement
has been duly authorized by all requisite action and is not in contravention of any law or
organizational documents and this Agreement has been duly executed by a duly authorized
officer or official of Seller; . . . .

141.    Maine's Site Location of Development Law, codified at 38 M.R.S.A. § 481, et. seq.

(the "Site Law"), applies to developments that may have a substantial effect upon the environment.

142.    The City's Development Property was subject to the Site Law.

143.    Section 483-A of the Site Law provides as follows:

Approval required.  A person may not. . . .in the case of a subdivision, sell or lease,
offer for sale or lease or cause to be sold or leased any development of state or
regional significance that may substantially affect the environment without first
having obtained approval. . . .from the department.

38 M.R.S.A. § 483-A.

144.    Additionally, 30-A M.R.S.A. § 4406, which concerns Planning and Land Use

Regulations for Subdivisions in Municipalities (like the City), states the following:

No person may sell, lease. . . .or convey for consideration, or offer or agree to sell,
lease. . . .or convey for consideration any land or dwelling unit in a subdivision that
has not been approved by the municipal reviewing authority of the municipality

where the subdivision is located and approved under [the Site Law] where applicable, and subsequently recorded in the proper registry of deeds.

145.    Further, Chapter 372 of the Maine Department of Environmental Protection rules implementing the Site Law, and specifically Section 12(E) thereof, provides in relevant part as follows:

12.  Standard Conditions of Approval. Unless otherwise specifically stated in the approval, all Board (or Staff) approvals shall be subject to the following standard conditions:

[…]

Transfer of Development. Unless otherwise provided in this approval, the applicant shall not sell, lease, assign or otherwise transfer the development or any portion thereof without prior written approval of the Board where the purpose or consequence of the transfer is to transfer any of the obligations of the developer as incorporated in this approval. Such approval shall be granted only if the applicant or transferee demonstrates to the Board that the transferee has the technical capacity and financial ability to comply with conditions of this approval and the proposals and plans contained in the application and supporting documents submitted by the applicant.

06-096 CMR Chapter 372 ("Chapter 372").

146.    Under Section 6 of the Amended P&S, the City agreed to be the subdivision applicant, subjecting itself to the approval requirements of the Site Law, 30-A M.R.S.A. § 4406, and Chapter 372.

147.    Pursuant to the Site Law, 30-A M.R.S.A. § 4406, and Chapter 372, the City was required to obtain approval from the Department of Environmental Protection, as well as final approval, rather than conditional approval, from the Planning Board, prior to selling any portion of the Development Property to Federated.

148.    Further, the City, as developer under the Site Law, was precluded from transferring any portion of the Development Property to Federated, by law, without prior approval of the

Department of Environmental Protection, where the effect of such transfer was to transfer any obligations of the subdivision applicant to the transferee.

149.    Lots 1, 3, 6, and 7 were a portion of the Development Property.

150.    In violation of Site Law, 30-A M.R.S.A. § 4406 and Chapter 372, the City sold Lots 1, 3, 6, and 7, which were a portion of a development subject to the Site Law, to Federated prior to obtaining written approval from the Department of Environmental Protection and prior to receiving full, as opposed to conditional, approval from the City's Planning Board.

151.    In selling Lots, 1, 3, 6, and 7 to Federated prior to obtaining approval of the Board, the City also effectively transferred its obligations as the developer to Federated, in violation of Chapter 372.

152.    Specifically, in selling Lots 1, 3, 6, and 7 to Federated without approval of the Department of Environmental Protection, and without full as opposed to conditional subdivision approval from the City's Planning Board, Federated effectively became responsible for the site work associated with the subdivision approval contained within the 2015 Approval – which it later attempted to have Federated post a performance guaranty for – in violation of applicable laws and rules of the State of Maine.

153.    After Closing, Federated was unable to obtain the necessary building permit for the Garage, because the City required Federated to cover a performance guaranty to cover the exact same work it impermissibly transferred to Federated in violation of State law.

154.    This performance guaranty was the responsibility of the subdivision applicant, i.e., the City, which was also the "developer" as defined under Maine law.

155.     As the subdivision applicant and developer, the City was properly responsible for the work required by the Midtown Project subdivision it was the applicant for, and thus any performance guaranty related to the same.

156.     Had the City not violated 38 M.R.S.A. § 483-A, 30-A M.R.S.A. § 4406 and Chapter 372, Federated would not have been improperly required to post the performance guaranty.

157.     At the time of Closing, the City was in breach of Section 3(c)(ii) because, contrary to its representation and warranty stating otherwise, it was in violation of 38 M.R.S.A. § 483-A, 30-A M.R.S.A. § 4406 and Chapter 372.

158.     Relatedly, at the time of Closing, the City was in breach of Section 3(c)(vii) of the Amended P&S because, contrary to its representation and warranty stating otherwise, it was in violation of 38 M.R.S.A. § 483-A, 30-A M.R.S.A. § 4406 and Chapter 372.

159.     As a direct and proximate cause of the City's breach, Federated has suffered and continues to suffer damages and is entitled to recover said damages from the City.

### COUNT III – BREACH OF CONTRACT
### As to the Amended Garage Agreement
### By Federated 04

160.     Federated restates and realleges the paragraphs 1 through 159 as if restated herein.

161.     The Amended Garage Agreement is and was at all relevant times hereto a valid and enforceable contract.

162.     Federated 04 has fully complied with its duties and obligations under the Amended Garage Agreement, and was never in default thereof.

163.     Section 2 of the Amended Garage Agreement provides in relevant part as follows:

The City shall provide a grant to [Federated] or its nominee of Nine Million Seven Thousand Dollars ($9,007,000.00) in City Grant Funds for use by [Federated] for the City Grant Funds Uses as defined below. . . .

26

164.    Section 4 of the Amended Garage Agreement provides in relevant part as follows:

With respect to all requisitions for disbursements of the City Grant Funds, the City and [Federated] agree as follows:

(a)    [Federated] shall deliver to the City a written request for payment (a "Requisition") . . . .

[…]

(d)    . . . . Each Requisition for disbursement shall be submitted at least five (5) days before the date for which the disbursement is requested, and the City shall make such advancement no later than fifteen (15) days after receipt of each Requisition to make such disbursement. . . .

165.    In or about September 27, 2017, Federated submitted its Second Garage Requisition.

166.    In or about October 2017, despite receiving Federated's Second Garage Requisition, the City failed to make such advancement within fifteen (15) days of its receipt.

167.    In or about October 2017, the City stopped disbursing funds to Federated.

168.    The City's failure to fund the Second Garage Requisition was a breach of a material term of the Amended Garage Agreement.

169.    As a direct and proximate cause of the City's breach, Federated has suffered and continues to suffer damages and is entitled to recover said damages from the City.

## COUNT IV – BREACH OF CONTRACT
### As to the Amended Garage Agreement
### By Federated 05

170.    Federated restates and realleges paragraphs 1 through 169 as if restated herein.

171.    The Amended Garage Agreement is and was at all relevant times hereto a valid and enforceable contract.

172.    The City and Federated intended to create an obligation to Federated 05 by way of the Amended Garage Agreement (e.g., the economic benefits that would be realized for Lots 1, 3 and 7 upon the garage's completion as part of the Midtown Project).

173.    The City has breached the Amended Garage Agreement as described hereinabove thereby, among other things, resulting in harm to Federated 05.

174.    As a direct and proximate cause of the City's breach of the Amended Garage Agreement, Federated has suffered and continues to suffer damages and it is entitled to recover said damages from the City.

## COUNT V – BREACH OF CONTRACT
### As to the Somerset Agreement
### By Federated 04

175.    Federated restates and realleges paragraphs 1 through 174 as if restated herein.

176.    The Somerset Agreement is and was at all times relevant hereto a valid and enforceable contract.

177.    Federated 04 has fully complied with its duties and obligations under the Amended Somerset Agreement and was never in default thereof.

178.    Section 2 of the Amended Somerset Agreement provides in relevant part:

Subject to the terms hereof, the City will fund two-thirds (2/3) of the Total Project Cost, and FEDEQ will fund one-third (1/3) of the Total Project Cost.

[…]

Prior to the issuance of a Building Permit for the Project, FEDEQ shall provide the City with evidence of its financial resources, in the amount of at least one-third of the Total Project Cost, available and dedicate to the costs of this Project, in a form reasonably acceptable to the City's Director of Finance, which may include a commitment from a commercial lender to fund requisitions for payment of Project costs.

179.    Section 4 of the Amended Somerset Agreement provides in relevant part:

The CONTRACTOR shall furnish to FEDEQ and to the CITY OF PORTLAND, upon execution of the Contract, a Contract Performance Bond and a Contract Labor and Materials Payment Bond each for the full amount of the Contract and issue by a surety company or surety companies authorized to do business in the State of Maine and approved by the City of Portland. . . . The bonds described in this section shall be deemed to satisfy the performance guaranty requirements for the Project as required by section 14-501 of the City of Portland Code of Ordinances, and no further performance guaranty shall be required.

180.    Section 3(d) of the Amended Somerset Agreement provides in relevant part:

(d)      . . . . Each Requisition for disbursement shall be submitted at least five (5) days before the date for which the disbursement is requested, and the City shall make such advancement no later than fifteen (15) days after receipt of each Requisition to make such disbursement.

181.    Section 2(b) of the Amended Somerset Agreement provides in relevant part:

(b)      In order to address both parties' concerns that the Total Project Costs could exceed the estimate stated above, the City and, FEDEQ will meet early in the development and design of this project to jointly and cooperatively manage said project's design, staging, procurement costs and construction costs; and said parties will continue to meet as reasonable necessary for this same purpose, and will work collaboratively to control procurement and construction costs. . . .

182.    In or about March 2018, by and through its March 2018 Letter, the City refused any disbursements under the Somerset Agreement unless and until Federated provided assurances of its financial resources to complete both the Somerset Agreement work and the Garage, a construction schedule and evidence that it had engaged contractors to complete the aforementioned work.

183.    Pursuant to the express terms of the Somerset Agreement, Federated was: (a) not required to provide the City with evidence of its financial resources up and until prior to the issuance of the building permit for the Somerset Agreement work (Section 2); and (b) not required to post a performance guaranty (Section 4).

184.    At all times relevant to this Complaint, the City's Code did not require any building permit for the street work contemplated by the Somerset Agreement.

185.    The City's refusal to fund Federated's Second Somerset Requisition until provision of adequate financial resources, rather than withholding a building permit until such resources were demonstrated was a breach of Section 2 of the Somerset Street Requisition.

186.    In addition, Federated delivered a construction schedule for the subject work pursuant to its construction management plan, on more than a dozen occasions, to the City between 2015 and March 2018, when the City conditionally approved such schedule.

187.    Federated was not contractually obligated to demonstrate that it had engaged contractors prior to being entitled to reimbursement via requisition under the Somerset Agreement.

188.    On March 16, 2018, the City confirmed, in writing, that it waived the requirement for a performance guaranty so that it could record the Midtown Project subdivision plat in order to convey the Project Property to Federated, but would not waive it for Federated with respect to approving its Building Permit application.

189.    In or about March 2018, the City repudiated the Somerset Agreement in its entirety when explaining its refusal to fund related requisitions.

190.    Specifically, on or about March 27, 2018, when it demanded and then denied Federated's Building Permit application in part because of a failure to post a performance guaranty in the form of a letter of credit or cash escrow (as opposed to a performance bond), the City unilaterally departed from the Project Agreements by ignoring the cumulative guaranty requirements thereof.  The City did so to its own benefit and to the detriment of Federated, notwithstanding its prior waiver thereof, as contemplated in (i) Section 4 of the Amended Somerset Agreement, (ii) its First Remaining Conditions Letter, (iii) its Second Remaining Conditions Letter, and (iv) as evidenced by its recordation of the Midtown Project's subdivision plat in order to convey the Project Property.

191.    The City's demand for a performance guaranty in any form other than a bond and its insistence on a guaranty of any sort after having waived same was a breach of Section 4 of the Somerset Agreement.

192.    The City's failure to fund any further Somerset Agreement requisitions after its last funding in June 2017 was also a breach of Section 3(d) of the Somerset Agreement.

193.    The City's failure to fund Federated's Second Somerset Requisition within fifteen (15) days of its filing was additionally a breach of Sections 2 and 3(d) of the Somerset Agreement.

194.    In or about 2018, Federated sent the City many written and other requests to engage in dialogue regarding construction and permitting expenses, to which the City did not respond.

195.    In failing to cooperatively collaborate with Federated for the purpose of finding common ground on construction and permitting expenses, the City further breached Section 2(b) of the Somerset Amended Agreement.

196.    As a direct and proximate cause of the City's repudiation of the Somerset Agreement and other breaches outlined hereinabove, Federated has suffered and continues to suffer damages and is entitled to recover said damages from the City.

### COUNT VI – BREACH OF CONTRACT
**As to the Somerset Agreement**
**By Federated 05**

197.    Federated restates and realleges paragraphs 1 through 196 as if restated herein.

198.    The Somerset Agreement is and was at all relevant times hereto a valid and enforceable contract.

199.    The City and Federated intended to create an obligation to Federated 05 by way of the Somerset Agreement (e.g., the economic benefits that would be realized for Lots 1, 3 and 7 upon the garage's completion as part of the Midtown Project).

200.    The City has breached the Somerset Agreement as described hereinabove thereby, among other things, resulting in harm to Federated 05.

201.    As a direct and proximate cause of the City's breach of the Somerset Agreement, Federated has suffered and continues to suffer damages and it is entitled to recover said damages from the City.

### COUNT VII – FRAUDULENT MISREPRESENTATION AND INDUCMENT
### By Federated

202.    Federated restates and realleges paragraphs 1 through 201 as if restated herein.

203.    In the alternative to Counts I – VI, the City's fraudulent misrepresentations to Federated, which induced Federated into Closing the Amended P&S, and upon which Federated reasonably relied to its detriment, renders the Amended P&S and any of the Project Agreements arising therefrom voidable at Federated's election.

*The MDP Letter*

204.    The City's MDP Confirmation Email, wherein it confirmed the long-term continuing validity of the 2014 Approval's Master Development Plan permit in the context of permitting a future amendment thereof without permit expiration, was a false representation of material fact.

205.    In justifiable reliance on the MDP Confirmation Email's contents as true, valid and enforceable, Federated acted thereupon and renegotiated all of its applicable vendor contracts, re-conceptualized the Midtown Project, reconfigured its entire approach to the Midtown Project timeline, and it acquired the Project Property prematurely and before it was obligated to do so.

206.    The City's retraction of the position it previously stated in the MDP Confirmation Email in January 2018 evidences that the City either knew that the representations in its MDP

Confirmation Email were false or proceeded in issuing such correspondence with reckless disregard for whether they were false or not.

207.    As a result of the City's misrepresentations in the MDP Confirmation Email, among other things detrimental to Federated, Federated was prevented from resolving issues that eventually precluded issuance of a Building Permit – the ultimate benefit of its bargain – for the Midtown Project.

*The Remaining Conditions Letters*

208.    On or about June 1, 2016, the City provided Federated the First Remaining Conditions Letter, which enumerated the remaining conditions precedent that Federated purportedly had to satisfy before obtaining the Building Permit necessary to start construction of the Midtown Project.

209.    The First Remaining Conditions Letter did not include any obligation for Federated to post a cash performance guaranty in the total amount of the Midtown Project's site work as a condition for approval of the Building Permit.

210.    On or about June 29, 2016, the City provided Federated the Second Remaining Conditions Letter, which reaffirmed the remaining conditions precedent that Federated purportedly had to satisfy before obtaining requisite Building Permit.

211.    The Second Remaining Conditions Letter did not include any obligation for Federated to post a cash performance guaranty in the total amount of the Midtown Project's site work as a condition for approval of the Building Permit.

212.    The First Remaining Conditions Letter and Second Remaining Conditions Letter followed numerous verbal communications between Federated and the City confirming remaining conditions, all of which excluded any reference to a performance guaranty.

213.    For at least the reason that the City recorded the Midtown Project subdivision plat without having first received or itself posted a performance guaranty (which under the City's then applicable City Code was a prerequisite to recordation in the absence of waiver), Federated justifiably relied on the truth and completeness of the representations in the First Remaining Conditions Letter and Second Remaining Conditions Letter when acquiring the Project Property and forming its understanding of the universe of any further conditions precedent to obtaining a Building Permit beyond those specifically enumerated therein.

214.    The City's failure to include any requirement that Federated post a cash performance guaranty was a willful omission of a material fact.

215.    Through the First Remaining Conditions Letter, as reaffirmed in the Second Remaining Conditions Letter, the City fraudulently induced Federated to proceed to Closing upon its acquisition of the Property, well before Federated was obligated to do so.

216.    Under Section 8 of the Amended P&S, Federated had the right to not close on the Property if it did not have the Building Permit at the time of Closing.

217.    This right was reaffirmed in the Third Amendment to P&S, Restated Third Amendment to P&S, Second Restated Third Amendment to P&S and Fourth Amendment to P&S.

218.    Had the City not omitted the aforementioned material facts, Federated would not have proceeded to close on the Property prior to its receipt of the Building Permit.

219.    After the Closing, the City required Federated to post a cash performance guaranty as a condition to obtaining the requisite Building Permit, despite its prior assertion that Federated was not required to do so.

220.    As a result of the City's requirement for a cash performance guaranty, Federated did not obtain the necessary Building Permit for the Garage.

221.    Federated relied on the City's representations in the First and Second Conditions Letters to its detriment.

222.    The City's conduct in fraudulently inducing Federated to Close the Amended P&S renders the Amended P&S and other applicable Project Agreements voidable at Federated's election.

### COUNT VIII – FAILURE TO PERFORM CONDITIONS PRECEDENT
### As to the Amended P&S
### By Federated

223.    Federated restates and realleges paragraphs 1 through 222 as if restated herein.

224.    In the alternative to Counts I – VI, the City's failure to perform certain conditions precedent to Closing renders the Amended P&S null and void at Federated's election.

225.    Section 7(h) of the Amended P&S provides in relevant part as follows:

> (h) if any subdivision or *other governmental approval* is required in order to convey the Property *as a separate parcel or lot* then Seller shall have obtained all such subdivisions and/or other governmental approvals and shall have recorded any and all required plans in connection with the same

(Emphasis added.)

226.    Under 38 M.R.S.A. § 483-A, 30-A M.R.S.A. § 4406, and Chapter 372, the City was required to obtain governmental approval to convey the Property as a "separate parcel or lot" apart from the larger subdivision Development Property, and was precluded from transferring or selling any portion of the Development Property without the prior written approval of the Department of Environmental Protection where the purpose or consequence of such transfer would be to transfer any of the obligations of the subdivision applicant to the transferee.

227.    The City was further legally prohibited from selling or conveying, or even agreeing to sell or convey, the Midtown Project property until municipal approval of the subdivision occurred.

228.    The City, by entering the Amended P&S prior to approval of the Midtown Project subdivision, violated applicable law as stated hereinabove.

229.    The City, by selling and conveying the Project Property to Federated prior to full, as opposed to conditional, approval, violated applicable law as stated hereinabove.

230.    As the contractually agreed-to subdivision applicant, the City violated the aforementioned laws and regulations when it transferred the Midtown Project property to Federated before completing the work contemplated on the Midtown Project subdivision, which was its responsibility as the project applicant.

231.    Because the City (i) failed to obtain the governmental approval to convey the Property as a "separate parcel or lot" apart from the larger subdivision Development Property as required by 38 M.R.S.A. § 483-A, 30-A M.R.S.A. § 4406, and Chapter 372, and (ii) further agreed to sell the Project Property to Federated before any approval was obtained for the Project Property (followed by actually selling the Project Property to Federated prior to full approval of the Midtown Project subdivision), and (iii) further because the City failed to complete the related subdivision work (and thus transferred its obligations as the applicant and developer to Federated at the time of sale without Department of Environmental Protection approval) the City failed to perform the condition precedent to Closing set forth in Section 7(h) of the Amended P&S.

232.    Section 7(d) of the Amended P&S provides in relevant part as follows:

> (d) all of Seller's obligations under this Agreement shall have been performed and all its representations and warranties shall be true and correct.

233.    Contrary to its representation and warranty otherwise, the City's representations and warranties in Sections 3(c)(ii) and 3(c)(vii) of the Amended P&S were not true and correct, because at the time of Closing the City was in violation of 38 M.R.S.A. § 483-A, 30-A M.R.S.A. § 4406, and Chapter 372.

234. The City's failure to perform the condition precedent to Closing set forth in Section 7(h) renders the Amended P&S and any Project Agreements arising from it null and void at Federated's election.

235. The City's failure to perform the condition precedent to Closing set forth in Section 7(d) renders the Amended P&S and any Project Agreements arising from it null and void at Federated's election.

## COUNT IX – VIOLATION OF 42 U.S.C. § 1983
### For Procedural Due Process
### By Federated 04

236. Federated restates and realleges paragraphs 1 through 235 as if restated herein.

237. Pursuant to 42 U.S.C. Section 1983, "[e]very person who under color of any statute, ordinance, regulation, custom, or usage, of any State. . . .subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

238. By virtue of the Amended P&S, as of September 23, 2021, Federated 04 was the lawful titleholder and property owner of Lot 6.

239. Upon information and belief, at some point presently unknown to Federated, the City rethought its decision to enter the Amended P&S and related Project Agreements with Federated—as opposed to contracting with local developers / developers known to the City and its decision makers—and the City attempted to cause the Federated walk away from of the Amended P&S and related Project Agreements.

240. Federated did not walk away from said agreements but, instead, fought the City and sought to protect their rights via, among other avenues, the 2019 Lawsuit.

241.    As of September 23, 2021, Federated and the City had been litigating certain matters related to the Project Agreements and Lot 6 for over two years via the 2019 Lawsuit.

242.    By the 2019 Complaint, Federated sought, among other things, to enforce their contractual rights in connection with the Project Agreements such that it could develop Lot 6 as contemplated by the Garage Agreement as previously agreed to by the City.

243.    During the Summer of 2021, the parties to the 2019 Complaint sought to mediate the 2019 Complaint. Federated made clear to the City it would not acquiesce to the City and the settlement was not achieved.

244.    While the 2019 Complaint was pending and settlement was being discussed, the City determined to take the Lot 6 from Federated 04 in an attempt to circumvent its contractual obligations to Federated 04 and those third parties intended to benefit from said contracts, such as Federated 05, and otherwise deprive Federated 04 its Constitutionally protected property rights.

245.    The City did in fact take Lot 6 by eminent domain under the color of state law and allegedly pursuant to the Commendation Order.

246.    In reality, the taking was a *fait accompli* well before the date of the Condemnation Order.

247.    The taking was a sham effectuated by the City and others, including but not limited to a particular local appraiser, a local law firm and its attorney(s) and others.

248.    Via that sham, the City and those other individuals referenced above, among other things, schemed to and actually prepared a fundamentally unfair and otherwise constitutionally flawed and intentionally understated appraisal for Lot 6, intentionally failed to provide Federated 04 lawful notice of the taking or opportunity to object, comment or otherwise participate in the

taking process as contemplated by federal law, and accelerated the taking process in a manner that deprived  Federated 04 of its Constitutional rights vis-à-vis its property.

249.    The City denied Federated 04 procedural due process when it unlawfully took Lot 6.

250.    The City did not do so for a proper, lawful or constitutionally protected purpose.

251.    The subject taking was particularly egregious here in that the City grossly abused its power through a concerted effort with the aforementioned persons to avoid its contractual obligations, and forced Federated into a detrimental position vis-à-vis its property and the protected contractual and Constitutional rights flowing therefrom and in connection therewith.

252.    Upon information and belief, the City plans to seek local developers / developers known to the City and its decision makers for the taken Lot 6.

253.    Federated 04 has been and continues to be harmed by the City's unconstitutional conduct and is entitled to recover all damages permitted at law and equity suffered as a result of same from the City.

### COUNT X – VIOLATION OF 42 U.S.C. § 1983
### For Equal Protection Violations
### By Federated

254.    Federated restates and realleges paragraphs 1 through 253 as if restated herein.

255.    Pursuant to the Fourteenth Amendment to the United States Constitution, "[n]o state shall. . . .deny to any person within its jurisdiction the equal protection of the laws".  U.S. Const. Amend. XIV.

256.    The 2015 Approval included well over 130 conditions of approval, more than any similar project approved by the City of comparable size by far.

257.    In the three years between the 2015 Approval's issuance of Federated's Building Permit application, Federated was unable, with full time staff and numerous vendors assigned to the Midtown Project, to clear all of the conditions of approval attached to its entitlements.

258.    Specifically, its construction management plan, a condition of approval, was never fully approved by the City notwithstanding 14 separate attempts to satisfy the City's feedback.

259.    When Federated's Building Permit application was denied in March 2018, the City cited as one reason among others the failure of Federated to post a performance guaranty.

260.    At the same time, the City acknowledged that it had waived the requirement for said guaranty so that it, as the seller of the Project Property, could record the requisite subdivision in order to appropriately reference a legal description in its deed of conveyance.

261.    The foregoing actions took place in the context of comments by O'Brien as the City's staff member ultimately tasked with the forward movement of the Midtown Project advising Federated that the City was "done with" the project.

262.    By attaching an unreasonable number of conditions of approval to the 2015 Approval, and by unreasonably failing to work with Federated to satisfy those conditions over the course of four calendar years, followed by the waiver of and then reinstitution of a purported performance guaranty requirement in order to permit the sale of Project Property without permitting construction of the project for which it was purchased, the City denied Federated equal protection of its laws in contravention of the Constitution of the United States.

263.    The foregoing actions constitute a discriminatory application of the City Code, an otherwise facially neutral law, because Federated was treated differently than similarly situated parties (e.g., other developers of comparably sized projects and other permitting applicants, such

as the City as subdivision applicant) and the City unequally applied the City Code for the express purpose of discriminating against Federated.

264.    Federated has been damaged by the aforementioned City actions, and unequal, obstructionist application of City Code, by being precluded from constructing the very project for which it acquired the Project Property in the first instance, and by the amount of money expended in reliance on its presumed ability to construct that project, including millions in project design and development costs in addition to the cost of acquiring the Midtown Project property itself.

265.    Federated has been deprived of a federal Constitutionally protected right by the actions above described, and such deprivation is the result of an abuse of the City's governmental power, exercised at a time when it simultaneously occupied the roles of financial partner, entitlement authority, and seller of the Project Property.

266.    Under 42 U.S.C. Section 1988, Federated is entitled to its costs in enforcing 42 U.S.C. Section 1983.

267.    Federated has been and continues to be harmed by the City's unconstitutional conduct and is entitled to recover all damages permitted at law and equity suffered as a result of same from the City.

## COUNT XI – VIOLATION OF 14 M.R.S. § 7551-B
### For Civil Trespass
### By Federated

268.    Federated restates and realleges paragraphs 1 through 120 as if restated herein.

269.    Pursuant to 14 M.R.S. § 7551-B, "[a] person who intentionally enters the land of another without permission and causes damage to property is liable to the owner in a civil action if the person: A.. . . .does other damage to any structure on property not that person's own; or B.

Throws, drops, deposits, discards, dumps or otherwise disposes of litter. . . .in any manner or amount, on property not that person's own." 14 M.R.S. § 7551-B(1).

270.    During the period of Federated's ownership of the Project Property, the City has routinely utilized such property for, among other things, storage of municipal snow, construction equipment for municipal road projects, and municipal police parking associated with speed traps or other traffic or neighborhood safety operations, all without permission from Federated.

271.    Throughout the course of the City's impermissible use of Federated's Project Property, the City engaged in significant disturbances of Federated's topsoil, and constructed a perimeter berm out of contaminated soil on Lot 3.

272.    By using the Project Property without permission as above-referenced, the City also further contaminated the Project Property by the deposit of contaminants contained within municipal snow and idling vehicles onto what is largely an impervious surface.

273.    Accordingly, the City has discarded waste material and, therefore, littered the Project Property without permission by Federated, by which Federated has been damaged to the extent it is now required to clean up such contaminants, restore Lot 3 to its previous state, and undertake any environmental remediation tasks associated with the City's unlawful soil disturbance.

274.    Pursuant to 14 M.R.S. § 7551-B, the City is liable to Federated for two times Federated's actual damages in remediating the waste and disturbances described above, the damages associated with any enforcement action undertaken as a result of environmental disturbances, and its attorneys fees in bringing this action.

### COUNT XI – VIOLATION OF U.S. CONST. AMEND. 5
#### For Inverse Condemnation
#### By Federated

275.    Federated restates and realleges paragraphs 1 through 267 as if restated herein.

276.    Following denial of its Building Permit application, Federated asked the City to administratively remove the easements and other encumbrances impacting the Project Property, in light of the purported expiration of the project entitlements to which those encumbrances related.

277.    The City refused or otherwise failed to respond to Federated's request.

278.    In failing to approve Federated's construction management plan notwithstanding fourteen (14) professionally prepared iterations thereof, acting to deny Federated's application for a Building Permit, after recording the Amended Garage Agreement on the title to Lot 6 at the closing of its sale of such property, while simultaneously subjecting the Project Property to an improperly recorded subdivision plat and the encumbrances stated thereon, which restrict development of the Midtown Project property to the very same project the City refused to permit Federated to construct notwithstanding its diligent and years-long efforts to do so, and refusing to mitigate the effects of the foregoing, the City effectively took Federated's property interests in the Project Property effective as of March 27, 2018, without just compensation, in violation of the Fifth Amendment to the United States Constitution.

279.    The site development limitations now existing on the Project Property have effectively rendered the Property's value worthless since March 2018, as the City's position regarding a performance guaranty has made it futile to make further application for a revised Midtown Project.

280.    Such limitations, coupled with the City's refusal to financially contribute to the Midtown Project and its extensive environmental remediation needs, are so severe and costly as to render development or use of the site economically infeasible.

281.    The City's actions are arbitrary and capricious and not reasonably or substantially related to any legitimate or recognized governmental interest.

282.    Federated is informed and believes, and thereon alleges, that it was the City's intent to effectuate a taking of the Midtown Project property without just compensation, and no compensation has been paid.

283.    As a direct and proximate result of the unconstitutional taking, Federated has suffered and continues to suffer damages, plus interest, the precise amount to be proven at the time of trial.

**DAMAGES**

284.    Federated restates and realleges paragraphs 1 through 283 as if restated herein.

285.    As a result of the City's conduct described herein above, Federated has been harmed and suffered damages in the form of, among other things, the subject purchase price, the diminution of property value, design and development costs and expenses, lost profits, as well as attorneys fees and legal costs and expenses.

**JURY DEMAND**

Federated demands a jury trial as to all matters addressed herein, to the extent permissible.

WHEREFORE, Federated prays this Court to:

A.  Enter judgment in their favor in connection with the Counts pled hereinabove, awarding Federated actual compensatory, consequential and punitive damages to the extent available;

B.  Enter an order rescinding the Amended P&S at Federated's election, restoring Federated to its prior status as it existed pre-agreement, including, but not limited to any equitable awards accounting for Federated's significant investment of time and resources in the Midtown Project;

C.  Award Federated their attorneys' fees and other permissible costs;

D.  Award Federated interest; and

E.  Enter any other award to Federated that this Court deems just and due.

Respectfully submitted,

**FEDEQ DV004, LLC and FEDEQ DV005, LLC**

By their attorneys,

*/s/ Patrick Venne*
Patrick Venne, Bar No 4760
pvenne@federatedcompanies.com
Law Office of Patrick J. Venne
42 Barnfield Lane
Gorham, Maine, 04038
297-274-1298

Thomas T. Reith
treith@burnslev.com
*Pro Hac Pending*
Kelly Kirby Ballentine
kballentine@burnslev.com
*Pro Hac Pending*
Richard B. Lumley
rlumley@burnslev.com
*Pro Hac Pending*
Burns & Levinson LLP
125 High Street
Boston, MA 02110
Dated: June 15, 2022                          617-345-3000