## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| FEDEQ DV004, LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) 2:22-cv-00187-JDL |
| | ) |
| CITY OF PORTLAND, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S RENEWED MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; DEFENDANT'S MOTION TO DISMISS/STAY PROCEEDINGS BASED ON FEDERAL ABSTENTION; PLAINTIFFS' EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION; AND PLAINTIFFS' MOTION FOR SANCTIONS

This case concerns a public-private partnership to develop a mixed-use neighborhood in Portland, known as the "Midtown Project," that would include residential buildings, retail space, and a parking garage. Plaintiffs FEDEQ DV004, LLC, and FEDEQ DV005, LLC, bring a twelve-count Complaint (ECF No. 1) against the City of Portland ("the City") alleging nine state law claims sounding in contract and tort and three federal law claims, all constitutional. The twelve counts arise from disputes involving a series of interrelated contracts between the parties about the Midtown Project. The City moves to dismiss the Complaint for failure to state a claim (ECF No. 33; the "Rule 12(b)(6) Motion") and based on the doctrine of federal abstention (ECF No. 42; the "Abstention Motion"). Also pending are the Plaintiffs' Emergency Motion for a Preliminary Injunction (ECF No. 50) and Motion for Sanctions (ECF No. 53).

# I. FACTUAL BACKGROUND

The following facts are drawn from the Complaint and attachments thereto. *See Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)." (quoting Fed. R. Civ. P. 10(c))). I treat the well-pleaded, non-conclusory factual allegations in the Complaint as true and draw all reasonable inferences therefrom in the Plaintiffs' favor. *See Back Beach Neighbors Comm. v. Town of Rockport*, 63 F.4th 126, 130 (1st Cir. 2023).

## A. The Project Agreements

Throughout this Order, Plaintiffs FEDEQ DV004, LLC, and FEDEQ DV005, LLC, are referred to individually as "FEDEQ 04" and "FEDEQ 05," respectively. This Order uses the term "Federated" to refer to FEDEQ 04 and FEDEQ 05 collectively, together with their predecessors in interest to the contracts underlying this dispute: The Federated Companies, LLC; Legacy Apartments, LLC; and FEDEQ DV001, LLC.[1] Prior to 2011, the City acquired approximately three acres of land that it subdivided into seven parcels (collectively, the "Development Property"). In 2011, the

---

[1] The City's Reply (ECF No. 63) to Federated's Response (ECF No. 58) to the Rule 12(b)(6) Motion challenges standing by questioning whether FEDEQ 04 and FEDEQ 05 are successors in interest to the City's counterparts in the contracts underlying this case. The Court discussed standing with the parties at the November 20, 2023, oral argument on the pending motions (ECF No. 68) and directed the Plaintiffs to file all documents that they relied on in asserting their status as successors in interest to the City's named contractual counterparts to the agreements involving the Midtown Project (ECF No. 70). Federated's responsive filing (ECF No. 73) added two assignment and assumption agreements to the record. *See infra* Part I.B. Based on those agreements, I treat, for purposes of this Order, FEDEQ 04 and FEDEQ 05 as having standing to bring their claims against the City. However, because the City has not been afforded an opportunity to respond to the documents the Plaintiffs filed in support of standing, my decision is tentative and subject to being reconsidered should the City continue to press the issue.

City selected Federated to acquire the Development Property and convert it into a mixed-use neighborhood (the "Midtown Project"). Between 2011 and 2016, Federated entered into a series of contracts with the City related to the purchase, sale, and development of the Development Property and a subset of that property ("the Project Property") (collectively, the "Project Agreements").

Five contracts between the City and Federated comprise the Project Agreements: (1) the Purchase and Sales Agreement ("PSA"); (2) the Parking Garage Contribution and Funding Agreement ("Garage Agreement"); (3) the Somerset Street Agreement ("Somerset Agreement"); (4) the Corporate Guaranty Agreement ("Guaranty"); and (5) the Job Creation Agreement ("Jobs Agreement").[2] The table below identifies the effective date[3] and the City's named contractual counterpart to each Project Agreement and their various amendments:

| Agreement | Effective Date | The City's Contractual Counterpart(s) |
|---|---|---|
| Original Purchase and Sale Agreement (ECF No. 1-1) | 06/23/2011 | ▪ The Federated Companies, LLC |
| Parking Garage Contribution and Funding Agreement (ECF No. 1-2) | 10/15/2012 | ▪ Legacy Park Apartments, LLC |
| Job Creation Agreement (ECF No. 1-3) | 10/15/2012 | ▪ Legacy Park Apartments, LLC |
| Corporate Guaranty Agreement (ECF No. 1-4) | 10/15/2012 | ▪ Legacy Park Apartments, LLC |
| First Amendment to the PSA (ECF No. 1-5) | 10/15/2012 | ▪ Legacy Park Apartments, LLC[4] |

---

[2] For clarity and convenience, this Order, aside from the table below, refers to the last and operative version of each of the Project Agreements as indicated here parenthetically.

[3] The "effective date" of each agreement reflects (1) the date when the agreement was fully executed by the named contracting parties; and/or (2) the date as provided in the terms of the agreement. Where an agreement's terms include an effective date different from the latest date of execution, the Table refers to the stated effective date.

[4] Although Legacy Park Apartments, LLC, is the City's named contractual counterpart to the First Amendment to the PSA, the manager of The Federated Companies, LLC, Jonathan Cox, signed the

| Agreement | Effective Date | The City's Contractual Counterpart(s) |
|---|---|---|
| Second Amendment to the PSA, First Amendment to Guaranty, and First Amendment to Garage Agreement (ECF No. 1-6) | 10/14/2014 | ▪ Legacy Park Apartments, LLC<br>▪ The Federated Companies, LLC<br>▪ FEDEQ DV001, LLC |
| Somerset Street Agreement (ECF No. 1-7) | 10/14/2014 | ▪ FEDEQ DV001, LLC |
| Second Amendment to Guaranty (ECF No. 1-8) | 02/02/2015 | ▪ Legacy Park Apartments, LLC<br>▪ The Federated Companies, LLC<br>▪ FEDEQ DV001, LLC |
| Third Amendment to the PSA (ECF No. 1-9) | 10/13/2015 | ▪ FEDEQ DV001, LLC |
| Amended and Restated Third Amendment to the PSA (ECF No. 1-10) | 02/22/2016 | ▪ FEDEQ DV001, LLC |
| Second Amended and Restated Third Amendment to the PSA (ECF No. 1-11) | 04/26/2016 | ▪ FEDEQ DV001, LLC |
| Fourth Amendment to the PSA, Second Amendment to Garage Agreement, Third Amendment to Guaranty (ECF No. 1-12) | 05/16/2016 | ▪ FEDEQ DV001, LLC<br>▪ Legacy Park Apartments, LLC (as Guarantor)<br>▪ The Federated Companies, LLC (as Guarantor) |

The last and operative versions of the Project Agreements relate to the purchase, sale, and development of the Project Property, which encompasses four of the seven Development Property parcels.[5]

### 1. The PSA

Under the PSA, Federated owns the Project Property for the purpose of developing the Midtown Project. Section 6 of the PSA requires Federated to "obtain the permits and approvals . . . necessary or desirable" to develop the Midtown Project, including for a parking garage on Lot 6, and identifies the City as the subdivision

---

agreement. Other agreements in the record identify Cox as a member or manager of Legacy at the time he executed those agreements in that capacity.

[5] The Development Property, or "Land" as defined in the original PSA, encompassed Lots 1, 2, 3, 5, 6, 7, and 8 of a subdivision plan approved by the Portland Planning Committee in December 2008. ECF No. 1-1 at 2. The Project Property consists of lots 1, 3, 6, and 7 of the Development Property.

applicant for the project.  ECF No. 1-1 at 6.  Section 8 of the PSA, on "Closing," allows Federated, if it has not received a building permit before the closing date, to either terminate the PSA or agree to proceed to closing without said permit.  Over the course of amending the PSA between 2011 and 2016, Federated and the City agreed to postpone the closing date various times and, ultimately, to June 16, 2016, in recognition that no building permit had issued.

### 2.  The Somerset Agreement

The Somerset Agreement provides for the improvement of the public thoroughfare known as Somerset Street, which is adjacent to the Project Property.  Section 4 of the Somerset Agreement states:

> The CONTRACTOR shall furnish to FEDEQ [DV001, LLC] and to the CITY OF PORTLAND, upon execution of the Contract, a Contract Performance Bond and a Contract Labor and Materials Payment Bond each for the full amount of the Contract and issue by a surety company or surety companies authorized to do business in the State of Maine and approved by the City of Portland. . . . The bonds described in this section shall be deemed to satisfy the performance guaranty requirements for the Project as required by section 14-501 of the City of Portland Code of Ordinances, and no further performance guaranty shall be required.

ECF No. 1 at 28-29, ¶ 179.

### 3.  The Garage Agreement

Under the Garage Agreement, the City agreed to disburse over $9 million in grant funds, obtained in part through a loan from the U.S. Department of Housing and Urban Development ("HUD"), to Federated to build a parking garage (the "Garage") on Lot 6 of the Project Property.  Lot 6 and the Garage to be built on it are central components of the Midtown Project.  Without Lot 6, the Midtown Project plans are "worthless."  ECF No. 1 at 20, ¶ 116.

### 4. The Guaranty

The Guaranty provides for certain guarantees by Federated related to the Midtown Project conditioned on receipt of grant funds from the City to build the Garage contemplated by the Garage Agreement.

### 5. The Jobs Agreement

Finally, under the Jobs Agreement, which conditionally transferred HUD's jobs creation requirements from the City to Federated, Federated agreed to create forty new full-time positions within two years of receiving a certificate of occupancy for the Garage in exchange for the $9 million in grant funds.

## B. Assignment and Assumption Agreements

In addition to the Project Agreements, another set of contracts is relevant to the parties' dispute: the four assignment and assumption agreements transferring the buyer's rights under the PSA among the Plaintiffs' predecessors in interest and, ultimately, to the Plaintiffs. Under the PSA, the buyer has title to the Project Property, "all rights and privileges appurtenant to [the Project Property,] and all improvements located" thereon. ECF No. 1-1 at 2; *see also* ECF No. 1-12 at 3 (redefining "Land" under the Fourth Amended PSA to comprise four of the seven lots contemplated by the original PSA). Through the first assignment and assumption (ECF No. 1-5 at 7-8), dated June 27, 2011, The Federated Companies, LLC, assigned "all of [its] right, title and interest in, to and under" the PSA to Legacy Park Apartments, LLC ("Legacy"). ECF No. 1-5 at 7. The second assignment and assumption (ECF No. 1-6 at 8-10), dated October 14, 2014, transferred the rights,

title, and interest under the PSA from Legacy to FEDEQ DV001, LLC ("FEDEQ 01"). All of the Project Agreements aside from the original PSA incorporate the first assignment and assumption, and all Project Agreements effective on or after October 14, 2014, either expressly or implicitly incorporate these first two assignment and assumption agreements.

Another two assignment and assumption agreements were signed on June 16, 2016, which was also the stated closing date in the last and operative version of the PSA.   Under one agreement (ECF No. 73 at 72-73), FEDEQ 01 assigned and transferred "its right, title and interest in and to" Lot 6 of the Project Property to FEDEQ 04.   The other agreement (ECF No. 73 at 74-75) transferred FEDEQ 01's rights, title, and interest in the remaining Project Property (Lots 1, 3, and 7) to FEDEQ 05.

## C.   Approvals and Permits

In or about 2014, the City conditionally approved Federated's initial plan for the Midtown Project.   The 2014 Approval was administratively appealed, eventually resulting in a revised, conditional approval by the City ("2015 Approval") for a project smaller in scope than envisioned in the original plan.   The 2015 Approval included over 130 conditions of approval, "more than any similar project approved by the City of comparable size by far."   ECF No. 1 at 39, ¶ 256.

A building permit from the City was also required for the Midtown Project. Federated applied for the building permit in or about January 2018.   On March 23, 2018, the City advised Federated that the City was prepared to issue a building

permit for the Midtown Project, conditioned on Federated posting a performance guaranty of over $10 million for all the site work to be completed.  Federated disagreed with the City's conclusion that the performance guaranty was a condition precedent to issuing the building permit.  On March 27, 2018, the City notified Federated that its building permit application had been denied for, among other reasons, failing to post a performance guaranty.

Meanwhile, the City, in its capacity as the Midtown Project subdivision applicant, recorded the subdivision plan approved as part of the 2015 Approval without having posted a performance guaranty for any part of the project.  Recording the subdivision plan allowed the City, in its capacity as the seller of the Project Property, to reference a legal description of the subdivision in its deed of conveyance to Federated.  According to Federated, the City's insistence that Federated post a performance guaranty "has made it futile to make further application for a revised Midtown Project."  ECF No. 1 at 43, ¶ 279.

After the City refused to issue the building permit, Federated asked the City to administratively remove the easements and other encumbrances on the Project Property because, by that point, the project entitlements to which those encumbrances related had purportedly expired.  The City refused or failed to respond to Federated's request.  The site development limitations that remain on the Project Property have "effectively rendered the Property's value worthless since March 2018."  ECF No. 1 at 43, ¶ 279.  Those limitations, together with the City's refusal to contribute financially to the Midtown Project, including its environmental

remediation needs, "render development or use of the site economically infeasible." ECF No. 1 at 43, ¶ 280.

## D.   The 2019 Lawsuit and Eminent Domain Proceedings

At some point, the City rethought its decision to enter the Project Agreements and attempted to cause Federated to "walk away" from those contracts. ECF No. 1 at 37, ¶ 239. Federated instead sought to protect its rights, including by bringing a lawsuit against the City in federal court on August 16, 2019, alleging claims for breach of the Somerset and Garage Agreements (the "2019 Lawsuit"). *See FEDEQ DV004, LLC, et al. v. City of Portland et al.*, No. 2:19-cv-00382-JHR (D. Me.). Federated and the City attempted to resolve the 2019 Lawsuit through mediation between May and September 2021 but failed to reach resolution.[6]

During the same period, the City took steps to initiate eminent domain proceedings on Lot 6 of the Project Property, where the Garage was to be constructed, and contracted with a third party to appraise the parcel as early as January 2021. The appraiser issued a report in May 2021 valuing Lot 6 at negative $120,000. On or about September 18, 2021, the City approved a condemnation order for Lot 6, which it recorded in the Cumberland County Registry of Deeds on or around September 23, 2021. The condemnation order stated that "public exigency requires the immediate taking of Lot 6 to ensure the timely construction of a public use garage or parking facility as defined by 30-A M.R.S. § 5401(5) on Lot 6."[7] ECF No. 2-15 at 4,

---

[6] The City and Federated agreed to dismiss the 2019 Lawsuit without prejudice in November 2021. *See FEDEQ DV004, LLC, et al. v. City of Portland et al.*, No. 2:19-cv-00382-JHR, ECF No. 163.

[7] 30-A M.R.S.A. § 5401(5) (West 2024) provides in full:

¶ (i).  The City did, in fact, later take Lot 6 by eminent domain, "repurchas[ing]" it for a nominal ten-dollar fee.  ECF No. 1 at 22, ¶ 130.  The City now plans to seek other developers to build a parking garage on Lot 6 and intends to rely on the construction-ready plans that Federated developed but the City did not pay for.

## II.  PROCEDURAL HISTORY

### A.  Federal Proceedings

In this federal action, the Plaintiffs[8] bring twelve counts against the City: (1) breach of contract as to miscellaneous provisions of the PSA (Count I); (2) breach of contract as to seller representations and warranties to the buyer in the PSA (Count II); (3) breach of contract as to the Garage Agreement (alleged by FEDEQ 04; Count III); (4) breach of contract as to the Garage Agreement (alleged by FEDEQ 05; Count IV); (5) breach of contract as to the Somerset Agreement (alleged by FEDEQ 04; Count V); (6) breach of contract as to the Somerset Agreement (alleged by FEDEQ 05; Count VI); (7) fraudulent misrepresentation and inducement (Count VII); (8) failure to perform conditions precedent as to the PSA (Count VIII); (9) a claim

---

**Parking facility.** "Parking facility" means any land or any interest in land, structure or portions of structures, and improvements on land or structures intended for the off-street parking of motor vehicles by the public for a fee.  Any such structure may be either single or multi-level and either at, above or below the surface.  This term also includes:

A.  Facilities incident to the operation of those properties for the parking of motor vehicles, including, without limitation, ancillary waiting rooms, lockers, space for concessions, stores and offices, terminal facilities for trucks and buses, facilities for servicing motor vehicles and for the sale of gasoline, oil and other accessories, and all facilities appurtenant to these incident operations; and

B.  All property, rights, easements and interests relating to the facility that are considered necessary for the construction or operation of the facility.

[8] Except where otherwise specified, FEDEQ 04 and FEDEQ 05 jointly bring the claims against the City.

under 42 U.S.C.A. § 1983 (West 2024) for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (alleged by FEDEQ 04; Count IX); (10) a section 1983 claim for violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (Count X); (11) civil trespass, in violation of 14 M.R.S.A. § 7551-B (West 2024) (Count XI); and (12) an inverse condemnation claim under the Fifth Amendment to the United States Constitution (Count XII).[9]

## B.   State Court Proceedings

On June 28, 2023, the City initiated a separate action in Cumberland County Superior Court, *City of Portland v. The Federated Companies, LLC, et al.*, Case No. PORSC-CV-2023-00246 ("the State action").[10]   The case was transferred to the Business & Consumer Docket of the Maine Superior Court and reassigned a docket number: Docket No. BCD-CIV-2024-00005.   The City acknowledges that the State action and this federal action both involve "claims for breach of contract based on the same contract and facts."[11]   ECF No. 42 at 2.   By the time the State action began, the litigation in this federal case had been underway for over a year.   The City filed the Rule 12(b)(6) Motion in this case on April 28, 2023, two months before proceeding against FEDEQ 04, FEDEQ 05, and other defendants in state court.   On July 19,

---

[9]   The Complaint identifies both the civil trespass and inverse condemnation claims as "Count XI." To avoid confusion, this Order refers to the trespass claim as Count XI and the inverse condemnation claim as Count XII.

[10]   The Defendants in the State action are The Federated Companies, LLC; Legacy Park Apartments, LLC; FEDEQ DV001, LLC; FEDEQ DV004, LLC; FEDEQ DV005, LLC; and Jonathan J. Cox.

[11]   The City's claims in the State action are for breach of contract (Count I) and unjust enrichment (Count II).

2023, three weeks after the State action began, the City moved to dismiss or, in the alternative, stay this federal case as a matter of abstention.

Before the State action was transferred to the Business & Consumer Docket, the defendants there moved to extend the answer deadline to run from the date of my order on FEDEQ 04 and FEDEQ 05's Emergency Motion for a Preliminary Injunction in this case. The Federated defendants in the State action also moved to dismiss the City's complaint for failure to state a claim. Meanwhile, the City moved for entry of default in the State action under Rule 55(a) of the Maine Rules of Civil Procedure. At a hearing and case management conference in March 2024, the parties to the State action agreed that both the state defendants' motion to extend and the City's motions for default were moot. At the same hearing, the state court denied the Federated defendants' motion to dismiss and directed them to answer the City's complaint.

## III.  DISCUSSION

### A.    The City's Rule 12(b)(6) Motion

#### 1. Legal Standard

To survive a motion to dismiss for failure to state a claim brought under Fed. R. Civ. P. 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013) (quoting Fed. R. Civ. P. 8(a)(2)). That "'short and plain' statement needs only enough detail to provide a defendant with "'fair notice of what the . . . claim is and the grounds upon which it rests.'"" *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)). "However, in order to 'show' an entitlement to relief a complaint must contain enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" *Id.* (quoting *Twombly*, 550 U.S. at 555); *see also García-Catalán*, 734 F.3d at 102-03 ("At the pleading stage, the plaintiff need not demonstrate that she is likely to prevail, but her claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). In short, the claim must be "plausible on its face." *García-Catalán*, 734 F.3d at 103 (quoting *Iqbal*, 556 U.S. at 678).

District courts take a two-step approach to assessing a motion to dismiss brought under Rule 12(b)(6). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Bos.*, 657 F.3d 39, 46 (1st Cir. 2011)).

## 2. Original Jurisdiction

Before reaching the merits of the Rule 12(b)(6) Motion, I briefly address the basis for the Court's jurisdiction over the Plaintiffs' claims. The Complaint expressly asserts that the Court has federal question jurisdiction over this case pursuant to 28 U.S.C.A. § 1331 (West 2024). Although the Complaint also includes facts relevant to

the citizenship of FEDEQ 04 and FEDEQ 05, those facts are insufficient to plead diversity jurisdiction and the Complaint does not explicitly plead diversity as a basis for federal jurisdiction.  The Complaint's assertions that none of FEDEQ 04 and FEDEQ 05's members reside in or have a principal place of business in Maine[12] are not tantamount to affirmatively pleading the citizenship of all the Plaintiffs' members, which requires "trac[ing] the citizenship of any member that is an unincorporated association through however many layers of members or partners there may be." *BRT Mgmt. LLC v. Malden Storage LLC*, 68 F.4th 691, 696 (1st Cir. 2023) (quoting *D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra*, 661 F.3d 124, 127 (1st Cir. 2011) (per curiam)).  Nor are the assertions made by Plaintiffs' counsel at the November 20, 2023, hearing that the Court may exercise diversity jurisdiction in this matter based on the citizenship of the parties.  Accordingly, I proceed to decide the City's Rule 12(b)(6) Motion based on Federated's assertion of federal question jurisdiction only.

---

[12]  In the 2019 Lawsuit, involving the same parties and no federal claims, the City moved to dismiss for lack of subject matter jurisdiction "based upon information and belief that a principal of one or both of the plaintiffs—i.e., Patrick Venne—is domiciled as a citizen of the City of Maine."  Case No. 2:19-cv-00382-JHR, ECF No. 43 at 1.  Venne was Federated's counsel in the 2019 Lawsuit and remains in that role in this case.  The basis for the City's belief as to Venne's member status was the plaintiffs' Initial Disclosures in the 2019 Lawsuit, which described Venne as a "current principal in [the] project underlying [the] dispute."  Case No. 2:19-cv-00382-JHR, ECF No. 43 at 5 (purportedly quoting the plaintiffs' Initial Disclosures).  The City withdrew its motion to dismiss for lack of jurisdiction (Case No. 2:19-cv-00382- JHR, ECF No. 52) shortly after Federated amended its complaint to include additional facts about some LLC members (Case No. 2:19-cv-00382-JHR, ECF No. 51 at 1-2, ¶ 2).  At the November 20, 2023, oral argument on the pending motions in this case, Venne represented that he is not and has never been a member of FEDEQ 04 or FEDEQ 05.

### 3.  Federal Claims

The Plaintiffs bring three claims against the City that raise federal questions: Count IX alleges a procedural due process claim under section 1983; Count X alleges an equal protection claim also under section 1983; and Count XII is an inverse condemnation claim brought under the Fifth Amendment.  For reasons I will explain, I grant the City's Rule 12(b)(6) Motion as to all three federal claims.

### a)  Procedural Due Process Claim (Count IX)

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  To state a claim for deprivation of procedural due process rights, a plaintiff "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him or her] of that interest without constitutionally adequate process." *García-González v. Puig-Morales*, 761 F.3d 81, 88 (1st Cir. 2014) (quoting *González-Droz v. González-Colón*, 660 F.3d 1, 13 (1st Cir. 2011)).

FEDEQ 04 claims that the City denied it procedural due process by unlawfully taking Lot 6, the planned location for the Garage component of the Midtown Project. FEDEQ 04 contends that the alleged taking, which occurred in September 2021, was unlawful because (1) the City's exercise of its eminent domain power was a "sham" involving an intentionally understated appraisal, ECF No. 1 at 38, ¶ 247; and (2) the City failed to provide FEDEQ 04 lawful notice of and an opportunity to object to the taking.

The City moves to dismiss FEDEQ 04's due process claim on two grounds, one procedural and one substantive.  First, the City argues that the claim is untimely under the 30-day appeals period that starts when a party receives notice of the "action or nonaction of municipal officers or the municipal legislative body in [eminent domain] proceedings."  23 M.R.S.A. § 3029 (West 2024); *see also* Me. R. Civ. P. 80B(b) (setting the applicable appeals period).  Second, the City argues that the manner in which the State takes property does not violate due process if the State provides an adequate post-deprivation remedy, which was available through the Rule 80B appeals process notwithstanding FEDEQ 04's failure to pursue that remedy.  The City also disputes the allegations about insufficient notice, insisting that it followed the standard process for exercising its eminent domain power "with all of the requisite notice provided at every step."  ECF No. 33 at 8.  FEDEQ 04 counters that its due process claim is timely under Maine's six-year statute of limitations for civil actions, 14 M.R.S.A. § 752 (West 2024); that there was insufficient pre-deprivation process; and that a Rule 80B appeal was not an adequate remedy because FEDEQ 04 seeks damages beyond the "just compensation" they are owed from the allegedly unlawful taking, namely "the actual 'damages' flowing from the City's improper use of and noncompliance with procedural takings requirements under applicable law."[13] ECF No. 58 at 6, 7.

---

[13]  In the Complaint, the due process claim concludes by asserting that FEDEQ 04 is "entitled to recover all damages permitted at law and equity suffered as a result" of the alleged due process violation alleged therein.  ECF No. 1 at 39, ¶ 253.

FEDEQ 04's argument is right on procedure but wrong on substance.  As to procedure, FEDEQ 04's due process claim is governed by the six-year statute of limitations under 14 M.R.S.A. § 752 and, accordingly, is timely.  *See Girard v. Dodd*, No. 2:16-cv-00165-LEW, 2019 WL 3535689, at *3 (D. Me. Aug. 2, 2019) (citing *Small v. Inhabitants of City of Belfast*, 796 F.2d 544, 546 (1st Cir. 1986)).  On substance, however, the availability of established procedures under Maine Rule of Civil Procedure 80B precludes FEDEQ 04's due process claim.

"[U]nauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.  For intentional . . . deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy."  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  However, "postdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action."  *Id.* at 532 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982)).

The alleged due process violation here is the result not of unconstitutional flaws in established state procedures, but of the City's purported scheming to skirt such procedures—or, by FEDEQ 04's framing, a "sham" perpetrated through unauthorized acts.[14]  ECF No. 1 at 38, ¶ 247.  As such, FEDEQ 04's claim turns on

---

[14]  The Complaint does not allege that the City's eminent domain procedures were inherently unconstitutional, but rather that the City and others conspired to perpetrate an elaborate ruse that

the availability of an adequate *post*-deprivation remedy. *See Hudson*, 468 U.S. at 533. Although Federated contends that the Complaint includes "ample facts to support its contention that an adequate state process . . . did not exist," it failed to cite any non-conclusory allegations from the Complaint in its written response to the Motion to Dismiss or when pressed for particulars at oral argument.[15]  ECF No. 58 at 6. The Complaint does not acknowledge the availability of the Rule 80B appeals process, let alone contest its adequacy. Instead, FEDEQ 04's due process claim alleges failings of the state's *pre*-deprivation procedures—*i.e.*, those undergirding the State's eminent domain power. *See, e.g.*, ECF No. 1 at 38, ¶¶ 245-46 ("The City did in fact take Lot 6 by eminent domain under the color of state law and allegedly pursuant to the Condemnation Order. In reality, the taking was a *fait accompli* well before the date of the Condemnation Order."). FEDEQ 04 belatedly argues that a Rule 80B appeal is an inadequate remedy that cannot redress its claims for damages beyond just compensation for the alleged taking, but that argument only appears in

---

subverted those established procedures—a conclusory legal assertion about alleged fraud that I need not, and do not, accept as true. *See* ECF No. 1 at 38-39, ¶¶ 247-48; ECF No. 1 at 17 ("The City's *Improper Use* of Eminent Domain" (emphasis added)); *see also Gilbert v. City of Cambridge*, 932 F.2d 51, 62 (1st Cir. 1991) ("To the extent that appellants' averments suggest that the permit process is a sham, the suggestion is a self-serving generality, counting for very little.").

[15]  When asked to identify relevant allegations in the Complaint at oral argument, the Plaintiffs cited paragraph 265, which provides:

> Federated has been deprived of a federal Constitutionally protected right by the actions above described, and such deprivation is the result of an abuse of the City's governmental power, exercised at a time when it simultaneously occupied the roles of financial partner, entitlement authority, and seller of the Project Property.

ECF No. 1 at 41, ¶ 265; *see also* ECF No. 72 at 23:22-25:2. The cited paragraph was pleaded as part of Federated's equal protection claim, not its due process claim and, besides, plainly does not allege that any aspect of an available post-deprivation remedy was inadequate. Federated's additional response that the 30-day appeals period under section 3029 and Maine Rule of Civil Procedure 80B is inadequate is neither stated expressly nor implied by other allegations in the Complaint.

response to the Motion to Dismiss, not in the Complaint.  Because the Complaint does not allege facts that, if proven, would show a post-deprivation remedy was either absent or inadequate, it fails to state a claim for an unlawful deprivation of procedural due process.  FEDEQ 04's due process claim (Count IX), therefore, is properly dismissed.

### b) Equal Protection Claim (Count X)

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.  Where, as here, a plaintiff brings a "class of one" equal protection claim, the complaint must allege facts sufficient to plausibly show that he or "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Back Beach Neighbors Comm.*, 63 F.4th at 130.

The First Circuit's recent decision in *McCoy v. Town of Pittsfield, NH*, is instructive on what constitutes an adequate pleading in a class-of-one equal protection claim related to land use:

> Class-of-one plaintiffs bear the burden of identifying comparators who are "similarly situated in all respects relevant to the challenged government action."  Plaintiffs must show an "extremely high degree of similarity" between themselves and those comparators.  This requirement "must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'"  "It is inadequate merely to point to nearby parcels in a vacuum and leave it to the municipality to disprove conclusory allegations that the owners of those parcels are similarly situated."

59 F.4th 497, 507-08 (1st Cir. 2023) (first quoting *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 640 (1st Cir. 2013); and then thrice quoting *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007)); *see also Freeman v. Town of Hudson*, 714 F.3d 29, 38-39 (1st Cir. 2013) (analyzing a class-of-one equal protection claim in the land-use context).

The Complaint alleges that the City violated the Equal Protection Clause by (1) attaching an unreasonable number of conditions to the 2015 Approval; (2) unreasonably failing to work with Federated to satisfy those conditions over four years; and (3) waiving a performance guaranty requirement for itself to facilitate its sale of property to Federated, but thereafter reinstating the guaranty requirement on Federated, and subsequently denying Federated a building permit for failing to post the guaranty. The City moves to dismiss the claim, which it says arises from alleged injuries suffered in 2015, as untimely under the six-year statute of limitations for civil claims under 14 M.R.S.A. § 752 and because Federated failed to plead that it was treated differently than similarly situated parties beyond a "bare assertion of inequity." ECF No. 33 at 10. Federated responds that its claim is timely because it concerns a harm that continued through "at least" 2018, ECF No. 58 at 7, and that the Complaint adequately alleges disparate treatment relative to similarly situated parties—namely "similar project[s] approved by the City of comparable size" and also the City as the subdivision applicant for the Midtown Project, ECF No. 1 at 39, ¶ 256.

Assuming that the Plaintiffs' equal protection claim is timely, I nonetheless conclude that the Complaint fails to plead facts sufficient to survive the City's Rule

12(b)(6) Motion.  More pointedly, the Complaint lacks the specificity to meet the high pleading standard for class-of-one equal protection claims in the land-use context. Federated alleges that "[t]he 2015 Approval included well over 130 conditions of approval, more than any similar project approved by the City of comparable size by far."  ECF No. 1 at 39, ¶ 256.  But the Complaint offers no more than that conclusory, threadbare recital of unequal treatment, and fails to provide any further details from which a trier of fact could find that the allegedly "similar" projects are "extremely" comparable "in *all* respects relevant to the challenged government action." *McCoy*, 59 F.4th at 507 (emphasis added); *see Iqbal*, 556 U.S. at 678.

The Complaint is likewise inadequate on Federated's separate theory of unconstitutionally disparate treatment related to the performance guaranty.  The Complaint alleges that the City waived the guaranty requirement for itself "so that it could record the Midtown Project subdivision plat in order to convey the Project Property to Federated, but would not waive it for Federated with respect to approving its Building Permit application."  ECF No. 1 at 30, ¶ 188.  Federated concedes, though, that the City was "empowered" to waive the guaranty requirement "pursuant to Section 14-501 of the City's Code of Ordinances."  ECF No. 1 at 13, ¶ 64.  Even treating, *arguendo*, the City and Federated as similarly situated in their respective roles as subdivision applicant and building permit applicant under the PSA, the Complaint fails to state any facts that could establish that the City's allegedly disparate treatment was irrational.  The Constitution does not require the City, as a permitting authority, to ignore its own unique municipal status backed by, as

Federated acknowledges, the "full faith and credit of . . . the taxpayers[,]" when deciding whether to impose or waive a performance guaranty on itself.  ECF No. 72 at 33:22-23.

Accordingly, the City's Rule 12(b)(6) Motion as to the equal protection claim is granted.

### c) Inverse Condemnation Claim (Count XII)

Finally, Federated alleges that the City effected an unlawful taking through a series of official actions.  Among them, the Complaint alleges that the City denied Federated's application for a building permit "while simultaneously subjecting the Project Property to an improperly recorded subdivision plat and the encumbrances stated thereon, which restrict development of the [Project Property] to the very same project the City refused to permit Federated to construct."  ECF No. 1 at 43, ¶ 278. The Complaint states further that those encumbrances impose "site development limitations . . . on the Project Property [that] have effectively rendered the Property's value worthless since March 2018" because any further application for a revised Midtown Project is "futile" given the City's sustained position that a building permit is conditioned on Federated posting a performance guaranty.  ECF No. 1 at 43, ¶ 279. To be clear, Federated's inverse condemnation claim is premised on the existence of encumbrances on Lots 1, 3, and 7 of the Project Property—not on the City's acquisition of Lot 6 by condemnation.

The City moves to dismiss this claim on the basis that Federated has not pleaded facts sufficient to support the conclusion or reasonable inference that the

City's conduct has stripped Federated of all economically beneficial uses of its land. In support, the City contends that the "mere fact that Plaintiffs cannot proceed with their originally envisioned development plans does not mean that they cannot reap any reasonable economic value out of their property," ECF No. 33 at 13, and that the Complaint does not include factual allegations from which the Court can conclude that the original Midtown Project is the only viable use of the subject property.

The Takings Clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides: "[P]rivate property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V.  To state a cognizable takings claim, plaintiffs must establish, first, an independent property interest and, second, that government action "cause[d] an illegal taking of th[at] interest[]." *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 973-74 (1st Cir. 1993).  Takings Clause violations come in two main varieties: physical takings and regulatory takings. *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002).  A physical taking involves a formal condemnation or physical appropriation of property.  *Id.*  A regulatory taking may occur when a government actor places "some significant restriction" on an owner's use of his or her property. *Id.*  Because Federated's claim arises out of the City's assorted actions allegedly affecting the value of Lots 1, 3, and 7 of the Project Property—not the City's acquisition of Lot 6 through eminent domain proceedings—the Complaint effectively asserts a regulatory taking, and I confine my analysis to that subset of takings law.

Regulatory restrictions on a landowner's use of his or her private property may constitute a taking if it prevents "*all* economically beneficial uses" of land. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original). To withstand the City's Rule 12(b)(6) Motion as to the inverse condemnation claim, the Complaint must state factual allegations that plausibly show Federated is entitled to just compensation because the City's conduct deprived it of all profitable and productive uses of Lots 1, 3, and 7. The Complaint alleges that the City's condemnation of Lot 6 "rendered Lots 1, 3 and 7 unsaleable as they are encumbered by significant land use restrictions specifically tied to a Garage site Federated no longer possesses." ECF No. 1 at 20, ¶ 116. The Complaint further asserts that the City "refused or otherwise failed to respond" to the Plaintiffs' request to remove those encumbrances after denying their building permit application. ECF No. 1 at 43, ¶ 277. Those encumbrances, the Complaint concludes, have so limited development on the Project Property as to render it "worthless." ECF No. 1 at 43, ¶ 279.

Although all well-pleaded, non-conclusory factual allegations are taken as true for the purpose of deciding the Rule 12(b)(6) Motion, other facts in the pleading before me belie Federated's dim view of its economic prospects. *See Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 n.1 (1st Cir. 2013))). The Complaint expressly references and incorporates the third-party appraisal the City commissioned before condemning Lot 6, which Federated attached

as an exhibit to the Complaint (ECF No. 2-14). The appraisal corroborates the Complaint's allegation that encumbrances remained on Lots 1, 3, and 7 in 2021, long after the City denied the Plaintiffs' building permit. However, the appraisal also assesses the cumulative post-taking value of those three parcels at over $13 million based on comparable sales of other "subdivided lots that were sold individually." ECF No. 2-14 at 67. Like Lots 1, 3, and 7, two of the three "comparables" were subject to encumbrances or easements. ECF No. 2-14 at 67-70. And though "the value in Lots 1, 3, and 7 would be highest with parking easements on Lot 6," each can "be developed independent of each other with built-in parking to support development." ECF No. 2-14 at 11. Despite questioning the appraiser's valuation of Lot 6, the Complaint does not mention, let alone cast doubt on, the assessments of Lots 1, 3, and 7. Granted, the Complaint does allege in broad and conclusory terms that the appraiser conspired with the City to effect a "sham" taking but, as discussed, I need not, and do not, take that allegation as true. *See supra* note 14. In short, the Complaint's allegations that the City's conduct rendered Lots 1, 3, and 7 "worthless" are directly contradicted and, therefore, undermined by other facts in the pleading. Because the Complaint does not plausibly show that the City deprived Federated of all profitable and productive uses of Lots 1, 3, and 7, the inverse condemnation claim is properly dismissed.

### 4. Supplemental Jurisdiction over Plaintiffs' State Claims

Having dismissed all claims over which the Court has original jurisdiction, I decline to exercise supplemental jurisdiction over Federated's state law claims. *See* 28 U.S.C.A. § 1367(c)(3) (West 2024). In any event, the state issues "substantially

predominate" over this case, which provides an additional basis for not exercising supplemental jurisdiction. *Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC*, 730 F.3d 67, 73 (1st Cir. 2013) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also* 28 U.S.C.A. § 1367(c)(2) (codifying *Gibbs*). The parties' primary disputes are six alleged contractual breaches and two related common-law claims (fraudulent misrepresentation and inducement; failure to perform conditions precedent), all of which turn on state law.[16] Even if Federated's three federal claims, which also implicate the Project Agreements, had been adequately pleaded—which they were not—those claims are peripheral to the contractual and quasi-contractual disputes that are the crux of this matter.[17] *Cf. Gibbs*, 383 U.S. at 727 ("Once it appears that . . . state law claim[s] constitute[] the real body of a case, to which the federal claim[s are] only an appendage, the state claim[s] may fairly be dismissed.").

Accordingly, and assuming the Court has no independent basis for federal jurisdiction over the state law claims, I decline to exercise supplemental jurisdiction.

## B.   The City's Abstention Motion and Federated's Motion to Preliminarily Enjoin the State Action

Dismissing the Plaintiffs' federal claims and declining to exercise supplemental jurisdiction over their state claims leaves nothing left to be resolved at

---

[16]   A ninth claim, for trespass in violation of 14 M.R.S.A. § 7551-B, also turns on state law.

[17]   In the 2019 Lawsuit, Federated did not bring any federal claims against the City. *See* Case No. 2:19-cv-00382-JHR, ECF No. 1. Of the three federal claims in this case, two arise from facts that predated the August 2019 filing of the complaint that initiated that precursor case. The third, a section 1983 claim alleging a due process violation, arises from the City's exercise of its eminent domain power in 2021 while the parties to the 2019 Lawsuit sought to mediate and before those parties stipulated to a dismissal.

this juncture in this federal proceeding.  Accordingly, the City's Abstention Motion
and Federated's Motion to Preliminarily Enjoin the State Action are denied as moot.
However, the City may again move the Court to abstain in the event Federated files
an amended complaint asserting its state law claims and adequately pleading
diversity of citizenship as the basis for the Court's jurisdiction.

## C.    Federated's Motion for Sanctions

Finally, I address Federated's Motion for Sanctions, which remains a live issue
notwithstanding my dismissal of the Complaint. *See Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384, 396 (1990) ("[I]mposition of a Rule 11 sanction is not a judgment on the
merits of an action.   Rather, it requires the determination of a collateral issue:
whether the attorney has abused the judicial process, and, if so, what sanction would
be appropriate.  Such a determination may be made after the principal suit has been
terminated.").   Federated moves to sanction the City's counsel for "unreasonably
multipl[ying] the proceedings in this case" by (1) orchestrating a taking of Federated's
property for pretextual reasons during the pendency of the 2019 Lawsuit; (2)
withdrawing a conflict-of-interest waiver as to Federated's initial counsel without
explanation; and (3) initiating a duplicate state proceeding under the false pretense
that a defendant that the City knew to be dissolved was a necessary party.  ECF No.
53 at 1.  Federated requests that the Court exercise its statutory authority under 28
U.S.C.A. § 1927 (West 2024) and its inherent authority to sanction the City's counsel
in the form of attorney's fees to cover the Plaintiffs' costs in responding to the State
action.

To issue sanctions under section 1927, the allegedly sanctionable conduct must evince "a studied disregard of the need for an orderly judicial process, or . . . reckless breach of the lawyer's obligations as an officer of the court." *Pimentel-Soto*, 957 F.3d 82, 85-86 (1st Cir. 2020) (quoting *Lamboy-Ortiz v. Ortiz-Vélez*, 630 F.3d 228, 245-46 (1st Cir. 2010)).   Similarly, sanctions issued under the Court's inherent authority require a finding of bad faith.   *See Roadway Exp., Inc. v. Piper*, 447 U.S. 754, 766-67 (1980).   The question, then, is whether defense counsel's procedural tactics in this case crossed the line from zealous advocacy to calculated gamesmanship demonstrating a disregard for the adverse consequences to the Court and Federated.

Of the allegedly sanctionable acts, only the decision to initiate the State action, which created a parallel proceeding and multiplied motion practice in this case, comes close to that line.   Defense counsel's primary justification for bringing the State action—uncertainty about this Court's jurisdiction given the inclusion of an allegedly non-diverse Defendant, FEDEQ 01—is plausible given the lack of documentation accompanying the Complaint conclusively showing that FEDEQ 04 and FEDEQ 05 have all the rights and liabilities of their alleged predecessors to the Project Agreements with the City.   Indeed, I had sufficient doubts about the Plaintiffs' alleged successor status based on their initial pleadings to probe the issue at oral argument after the issue had been briefed and to then require Federated to submit additional documentation supporting its position.   Defense counsel's rationale is all the more plausible because the Complaint only asserts 28 U.S.C.A. § 1331 as the basis for federal jurisdiction, which I find that the City contests in good faith, and because

the Plaintiffs failed to explicitly plead diversity of citizenship as a basis for federal jurisdiction.

Defense counsel's decision to file the State action fell well within the bounds of an appropriate effort to protect a client's interest in the face of uncertainty, and was neither a duplicitous attempt to circumvent this Court or to frustrate the City's adversary, as Federated suggests.

## IV.  CONCLUSION

For the foregoing reasons, the City's Renewed Motion to Dismiss under Rule 12(b)(6) (ECF No. 33) is **GRANTED** premised on Federated's assertion of federal question jurisdiction; the City's Motion to Dismiss, or in the alternative, Stay Proceedings based on Federal Abstention (ECF No. 42) is **DENIED** as moot; Federated's Emergency Motion for a Preliminary Injunction to Enjoin State Proceedings (ECF No. 50) is **DENIED** as moot; and Federated's Motion for Sanctions (ECF No. 53) is **DENIED**.

Because this Order does not finally address whether the Court has an independent jurisdictional basis over Federated's state law claims based on diversity of citizenship, as Federated argues in response to the City's Renewed Motion to Dismiss, it is further **ORDERED** that in the event Federated still desires to proceed on its state law claims in this federal proceeding, it is granted leave to file, within seven (7) business days of the issuance of this Order, (1) an amended complaint asserting diversity jurisdiction as the basis for federal jurisdiction under 28 U.S.C.A § 1332(a) (West 2024) including relevant facts to support that assertion; and (2) an

amended, up-to-date disclosure statement that adequately pleads the citizenship of all its citizens, consistent with Federal Rule of Civil Procedure 7.1(a)(2) and the dictates of *BRT Mgmt. LLC v. Malden Storage LLC*, 68 F.4th 691, 696 (1st Cir. 2023). In the absence of such submissions, a final judgment dismissing this action shall enter.

**SO ORDERED.**

**Dated this 31st day of March, 2024.**

                **/s/ Jon D. Levy**
              **U.S. DISTRICT JUDGE**